

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-31-2001

# General Electric Co v. Deutz AG

Precedential or Non-Precedential:

Docket 00-2387

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"General Electric Co v. Deutz AG" (2001). *2001 Decisions.* Paper 251.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/251

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 31, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2387

GENERAL ELECTRIC COMPANY

v.

DEUTZ AG,

            Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civ. No. 98-00370E)
District Judge: Honorable Sean J. McLaughlin

Argued: June 26, 2001

Before: NYGAARD, WEIS, and REAVLEY,*
Circuit Judges

(Filed: October 31, 2001)

Michael E. Barry (ARGUED)
Evan S. Williams
Gardner, Carton & Douglas
321 North Clark Street, Suite 3400
Chicago, Illinois 60610-4795

_____

*Honorable Thomas M. Reavley, United States Circuit Judge for the Fifth
Circuit, sitting by designation.

Kenneth Wargo
Quinn, Buseck, Leemhuis, Toohey
 & Kroto, Inc.
2222 West Grandview Boulevard
Erie, Pennsylvania 16506-4509

Attorneys for Appellant

David W. Rivkin, Esq. (ARGUED)
Frances L. Kellner, Esq.
Debevoise & Plimpton
919 Third Avenue
New York, New York 10022

Roger H. Taft, Esq.
MacDonald, Illig, Jones &
 Britton, L.L.P.
100 State Street, Suite 700
Erie, Pennsylvania 16507

Attorneys For Appellee

OPINION OF THE COURT

WEIS, Circuit Judge.

In this breach of contract suit, the District Court found that the defendant, a German guarantor, had sufficient contacts with Pennsylvania to be subject to personal jurisdiction. After a jury determination, the Court also found that the defendant was not entitled to invoke the arbitration clause in the underlying contract signed by its subsidiary. We will affirm these rulings. The Court also enjoined the defendant from applying to the English courts to enforce the alleged right to arbitration. We will reverse the grant of that injunction principally on the grounds of comity.

In June 1993, plaintiff General Electric, a New York corporation with manufacturing facilities in western Pennsylvania, entered into a contract with Moteren-Werke Mannheim AG, a German corporation with headquarters in Mannheim, Germany. Essentially, the agreement provided that Moteren-Werke would design, and General Electric

2

would manufacture, high horsepower diesel engines for locomotives. The contract also included a section in which Deutz AG,[1] the parent company of Moteren-Werke, guaranteed the obligations of its subsidiary.

By late 1997, the joint venture was encountering difficulties, and General Electric eventually called upon Deutz to provide the additional funding necessary for the work to continue. The parties held extended discussions, but were unable to resolve their differences. In December 1998, General Electric filed suit in the United States District Court for the Western District of Pennsylvania, asserting breach of contract claims against Deutz. The complaint sought damages as a result of lost sales and diversion of resources toward tasks that were the contractual responsibility of Moteren-Werke.

Deutz moved to dismiss for lack of personal jurisdiction or, alternatively, to compel international arbitration as it alleged the contract required. In July 1999, while these matters were proceeding in the District Court, Deutz sought arbitration before a panel of the International Arbitration Association in London.

The District Court issued an Opinion and Order on December 29, 1999, holding that Deutz's contacts with the forum state, made in the course of pre-contract negotiations and post-contract visits by Deutz executives in an effort to resolve the parties' dispute, provided sufficient evidence to support a finding of specific jurisdiction. The Court also ruled that the language of the contract did not unambiguously include Deutz within the scope of its arbitration provisions. The issue was submitted to a jury, which found that Deutz was not entitled to arbitration.

In April 2000, before the arbitration panel issued a decision, Deutz petitioned the High Court in London to enjoin General Electric from further proceedings in the Western District of Pennsylvania. The High Court declined to issue an injunction.

_____

1. At the time the contract was signed, Deutz was known as Klockner-Humboldt-Deutz. It was the latter entity, often referred to as "KHD," that actually signed the contract. For convenience, we will refer to the company throughout this Opinion as "Deutz," the name it later assumed.

On July 31, 2000, the District Court enjoined Deutz from resorting to the High Court in the future. It was not until November 14, 2000, that the arbitration Panel held that General Electric and Deutz had not agreed to arbitrate their contractual disputes. Deutz has appealed all of the orders of the District Court.

I.

We first address our appellate jurisdiction. Generally speaking, an order finding personal jurisdiction is interlocutory and non-appealable. In this case, however, we have jurisdiction over the appeal from the injunction. 28 U.S.C. S 1292(a)(1). Interlocutory orders that are "inextricably bound" to an injunction may also be considered in the same appeal. Kershner v. Mazurkiewicz, 670 F.2d 440, 449 (3d Cir. 1982) (en banc); see also Marshak v. Treadwell, 240 F.3d 184, 190 (3d Cir. 2001) ("When we have jurisdiction to review an order relating to an injunction under S 1292(a)(1), our jurisdiction extends to matters inextricably linked to the appealable order.").

The order finding personal jurisdiction is essential to the validity of the injunction in this case. If jurisdiction does not exist, then the District Court necessarily lacked the power to issue the injunction. Accordingly, the personal jurisdiction matter is properly before us.

The ruling finding the arbitration clause inapplicable to Deutz is appealable under 9 U.S.C. S 16(a)(1). Again, there is an unmistakable overlap of issues between the injunction and the legitimacy of the order denying arbitration. We therefore have appellate jurisdiction over the orders presented in this appeal.

II.

PERSONAL JURISDICTION

Due process shields persons from the judgments of a forum with which they have established no substantial ties or relationship. In order to be subject to personal jurisdiction, a defendant's conduct in connection with the

4

forum state must be such that he may "reasonably anticipate being haled into court there." World-wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

Once it is challenged, the burden rests upon the plaintiff to establish personal jurisdiction. Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992). A nexus between the defendant, the forum and the litigation is the essential foundation of in personam jurisdiction.

Personal jurisdiction may be either general or specific. A defendant is subject to general jurisdiction when it has continuous and systematic contacts with the forum state. Helicopteros Nacionales de Columbia, S.A. v. Hall , 466 U.S. 408, 414-16 (1984).

Specific jurisdiction is established when a non-resident defendant has "purposefully directed" his activities at a resident of the forum and the injury arises from or is related to those activities. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985); see also Dollar Sav. Bank v. First Sec. Bank of Utah, N.A., 746 F.2d 208 (3d Cir. 1984) (discussing personal jurisdiction).

Questions of specific jurisdiction are properly tied to the particular claims asserted. In contract cases, courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach. Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999). Parties who "reach out beyond [their] state and create continuing relationships and obligations with citizens of another state" are subject to the regulations of their activity in that undertaking. Burger King, 471 U.S. at 473 (quotations omitted). Courts are not reluctant to find personal jurisdiction in such instances. "[M]odern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity . .. ." Id. at 474.

Specific jurisdiction frequently depends on physical contacts with the forum. Actual presence during pre-contractual negotiations, performance, and resolution of post-contract difficulties is generally factored into the

5

jurisdictional determination. Remick v. Manfredy , 238 F.3d 248, 255–56 (3d Cir. 2001); Farino, 960 F.2d at 1223–24. In modern commercial business arrangements, however, communication by electronic facilities, rather than physical presence, is the rule. Where these types of long–term relationships have been established, actual territorial presence becomes less determinative. Burger King , 471 U.S. at 476.

It is not significant that one or the other party initiated the relationship. Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 150 (3d Cir. 1992). In the commercial milieu, the intention to establish a common venture extending over a substantial period of time is a more important consideration.

The record here demonstrates both physical contacts and a deliberate assumption of long–term obligations. In 1993, when it began negotiations with General Electric, Moteren–Werke was one of several subsidiaries of Deutz. Both companies retained the same law firm in Philadelphia, Pennsylvania to represent their interests. After Moteren–Werke had reached an agreement with General Electric on most of the contract's terms, the document was reviewed by Dr. Gunther Wagner, Executive Vice–President of Deutz and a member of its Board of Directors.

Moteren–Werke began performing its contractual obligations in Pennsylvania shortly after the agreement was signed on June 15, 1993. The following year, Dr. Wagner, who was not only a Deutz executive but also a member of the Moteren–Werke management board responsible for its engine business, met with General Electric officials in Pennsylvania. The parties addressed Deutz's financial stability as well as other matters related to performance of the contract.

In 1996, Anton Schneider, Chairman of Deutz's Executive Board, joined Moteren–Werke officials in a tour of General Electric's Erie and Grove City, Pennsylvania facilities. At that time, he discussed with General Electric officials such matters as the development status of the engines and the level of resources required to complete the venture.

6

In mid-1996, Deutz moved to curtail its subsidiaries' losses and reduce the number of Moteren-Werke employees on the General Electric project. The following year, the parties held a conference in Erie, Pennsylvania; in attendance were Peter Stark, a member of Deutz's management board and chairman of the management board of Moteren-Werke, three other Moteren-Werke employees, and several General Electric officials. Stark promised that Deutz would supply additional resources for the project. He returned to Erie in February 1998 to determine if a new engine was ready for marketing.

In mid-April 1998, Deutz announced its intention to completely take over the Moteren-Werke business. Dr. Leopold Mikulic, a vice president of Deutz, traveled to Erie on three separate occasions in June and July of 1998 for meetings with General Electric representatives. Deutz's Chairman Schneider accompanied him on the last of these occasions. Neither these sessions nor extensive correspondence enabled the companies to resolve their dispute. Accordingly, on December 22, 1998, General Electric filed suit in the District Court against Deutz alone, alleging that it and Moteren-Werke had breached the contract.[2]

Deutz's motion for dismissal contended that the Court lacked personal jurisdiction because the Deutz officials who came from Germany were acting solely on behalf of Moteren-Werke and did not represent its parent company. The District Court rejected that contention, and we do not find fault with its conclusion. The record reveals that Deutz failed to keep its presence or interests separate from those of Moteren-Werke. Deutz's financial status, a matter critical to its obligations as guarantor, was a frequent subject at the conferences held by the companies. Deutz's continued requests for additional financial contributions from General Electric were likewise intimately related to the guarantor's liability.

The Deutz and Moteren-Werke entities made little effort to maintain their independence. The overlapping and

_____

2. Moteren-Werke was not named as a defendant, presumably because it was bound by the arbitration clause in the contract.

interlocking committees and officials came close to creating a de facto alter ego arrangement.3  The visits by Deutz officials were not casual or fortuitous events, but serious efforts aimed at furthering the joint commercial enterprise. Deutz's status as a guarantor was not merely incidental, but was an important, perhaps indispensable, ingredient of the project, and the stakes were not minimal.

In sum, the behavior of Deutz and its officials clearly amounts to "purposeful direction" of business activity toward General Electric, a Pennsylvania resident. It is also beyond dispute that this suit arose out of Deutz's contractual endeavors. Finally, Pennsylvania's assertion of personal jurisdiction over Deutz is neither unfair nor unreasonable.

Unquestionably, it is less convenient for a German corporation to litigate in Pennsylvania, but Deutz had actively overseen the performance of the contract in that state for five years with no apparent difficulties in communication or travel. Given that the contract was performed primarily in Pennsylvania, General Electric has an obvious interest in conducting this litigation there. Deutz, moreover, has failed to present any persuasive reason why the matter should not proceed in that forum. See Travelers Health Ass'n v. Virginia, 339 U.S. 643, 648 (1950) (discussing state's interest that contractual obligations be observed).

Thus, we conclude that the District Court correctly determined that Deutz's activities adequately supported a finding of specific jurisdiction.

_____

3. On January 27, 1999, some months after General Electric filed this suit, Deutz purchased all of Moteren-Werke's assets and obligations under the 1993 agreement. As the District Court observed, that transaction did not affect Deutz's purported arbitration rights vis-a-vis General Electric.

III.

THE ARBITRATION AGREEMENT

As its alternate challenge to the District Court's jurisdiction, Deutz insisted that as guarantor, it and General Electric were bound by the terms of the arbitration provisions in the Moteren-Werke contract. Deutz contended that the question of arbitrability was one for the arbiters to decide in the first instance. Because the arbitration clause did not clearly and unmistakably provide for arbitral determination of jurisdiction, however, the Court ruled that it must resolve the issue. See AT&T Tech., Inc. v. Communications Workers of Am., 475 U.S. 643, 651 (1986) ("It is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances . . . ."). As events developed, Deutz ultimately did obtain a decision by the arbitration panel on jurisdiction, though it was adverse. Be that as it may, we are not relieved of our responsibility to review the District Court's ruling.

The contract is titled "Commercial Agreement dated June 15th, 1993 between Moteren-Werke Mannheim AG and General Electric Company," indicating that the Agreement was between those two entities. Those companies initialed every page of the Agreement; Deutz did not.

Section 7.01 provides that "[a]ll disputes, controversies, and claims directly or indirectly arising out of or in relation to this Agreement" shall be submitted to arbitration. Elsewhere in Article 7, which establishes arbitration procedures, the contract states that General Electric and Moteren-Werke would nominate the arbiters and that General Electric and Moteren-Werke agree to certain conditions. Deutz is not mentioned in that section.

Deutz signed the contract in a separate signature block, specifying that it was a party "for purposes of the obligations set forth in Section 9.08 hereof and Sections 4.05, 4.06, and 4.07 hereof." Section 9.08 contains the guaranty, and Sections 4.05 through 4.07 require the parties and their affiliates to maintain the confidentiality of design and other information. Section 9.04, the only other

portion of the agreement that mentions Deutz, provides that a copy of any notice to Moteren-Werke should also be sent to its parent company.

General Electric argued that Deutz had only agreed to be bound to the specific portions of the contract listed in the signature block, and had not expressly or impliedly adopted the arbitration clause. Deutz responded that although it limited its participation to specific portions of the agreement, the framework of that document, including such provisions as notice, governing law, and dispute resolution, was intended to be part of its commitment.

Applying the forum's conflicts of laws doctrine, the District Court concluded that Pennsylvania law should govern because that state had the greatest interest in the outcome of the dispute. That forum was the site of most of the contract's performance, as well as the location of much of the pre-contract negotiations. Although the arbitration clause called for the application of Swiss law, that provision applied to the arbitration proceeding, not to the initial determination of whether there had been an agreement on who would decide arbitrability. In any event, there did not appear to be any substantial difference between Pennsylvania and Swiss law in this respect.

After giving due consideration to the language of the contract and the parties' conflicting interpretations, the Court concluded that the arbitration clause was ambiguous. Accordingly, the matter was submitted to a jury as permitted by the Federal Arbitration Act. See 9 U.S.C. S 4. After two days of testimony from both parties' negotiators, the jury returned a special verdict, finding that General Electric and Deutz had not agreed to arbitrate their disputes.

Deutz now contests the District Court's determination that the arbitration clause was ambiguous. Having reviewed the contractual language, however, we are not persuaded that the District Court's ruling was erroneous. In finding that the contentions of both parties were reasonable, the Court took an even-handed view of the dispute that cannot, we conclude, fairly be criticized.

10

Deutz points to landmark Supreme Court decisions in support of its position that federal policy favors arbitration for the resolution of international commercial disputes, see Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985), and that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). Although we agree that providing for dispute resolution in a neutral forum by an acknowledged competent agency is highly desirable, the matter does not end there. A court may only compel a party to arbitrate where that party has entered into a written agreement to do so. E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., No. 00-3550, 2001 WL 1229797, at *4 (3d Cir. Oct. 15, 2001) (quotations omitted).

The United States Courts certainly recognize international arbitration agreements. Our nation, like the United Kingdom, Germany and scores of other countries, has adopted the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("The New York Convention"), June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, reprinted in 9 U.S.C. S 201 note. The Federal Arbitration Act implements the United States' accession to the Convention, see 9 U.S.C.SS 201-08, and provides that it "shall be enforced in United States courts . . . ." Id. S 201. The arbitration clause in the instant case falls within the ambit of the Convention and the Federal Arbitration Act.

As the Supreme Court observed in Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n.15 (1974), the goal of the Convention is to encourage the recognition and enforcement of commercial contracts and to unify the standards by which arbitration agreements are observed. We have commented that "[t]he policy of the Convention is best served by an approach which leads to upholding agreements to arbitrate." Rhone Mediterranee Compagnia Francese di Assicurazioni E Riassicurazoni v. Lauro , 712 F.2d 50, 54 (3d Cir. 1983).

Federal law applies to the interpretation of arbitration agreements. Scherk, 417 U.S. at 519-20; Becker Autoradio

U.S.A., Inc. v. Becker Autoradiowerk GmbH, 585 F.2d 39, 43 (3d Cir. 1978). If the parties have stipulated that certain disputes will be submitted to arbitration and that the law of a particular jurisdiction will govern the controversy, federal courts will enforce that agreement. Becker Autoradio, 585 F.2d at 43.

Thus, "whether a particular dispute is within the class of those disputes governed by the arbitration and choice of law clause is a matter of federal law." Id . The court decides the arbitrability of a dispute. Id. at 44 n.10. Although the issue of ambiguity per se is one of law, resolution of the uncertainty is one for the fact-finder. See Ram Constr. Co. v. Am. States Ins. Co., 749 F.2d 1049, 1052 (3d Cir. 1984).

In general, then, federal rather than state law governs international arbitration agreements. It appears, however, that there is a limited exception to this rule where the question is whether the controversy is arbitrable.

The Supreme Court has explained that if the arbitration agreement does not provide that the question of arbitrability vel non is to be decided by the arbitrators, then a court determines the issue. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944–47 (1995). In so doing, a court should apply ordinary state law principles governing contract formation. Id. at 944. "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." Id. (internal quotations omitted). On the contrary,"the law treats silence or ambiguity about the question who (primarily) should decide arbitrability differently from the way it treats silence or ambiguity about the question whether a particular merits-related dispute is arbitrable . . . ." Id. (internal quotations omitted).

In these situations, the law reverses the ordinary presumption of arbitrability. Id. at 944–45. This approach reflects a reluctance to "force unwilling parties to arbitrate a matter they reasonably would have thought a judge . . . would decide." Id. at 945.

We recognize that First Options is a domestic arbitration case, but the international nature of the present litigation does not affect the application of First Options ' principles.

In any event, the question of whether federal or state law applies is not a determinative factor at this point. Neither party urges the application of federal law to the interpretation of the agreement; they have limited their choices to either Swiss or Pennsylvania law. In general, we respect the choice of law that parties agree upon to resolve their private disputes. See Assicurazioni Generali, S.P.A. v. Clover, 195 F.3d 161, 164-65 (3d Cir. 1999); see also 19 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Fed. Prac. & Proc. S 4514, at 135 (2d ed. Supp. 2001) ("[T]he law ordinarily allows parties to a contract to structure their affairs by choosing to have their contract governed by the body of law that best suits their needs . . . ."). In addition, we doubt that the application of federal law would change the outcome of this litigation in any significant respect.

Deutz further contends that the special verdict slip given to the jurors misled them by asking whether General Electric and Deutz "both agreed to arbitrate difficulties with each other." Deutz's only objection to this language at trial was aimed at the use of the word "both;" as its attorney stated, "[w]e have two people, they either agreed or didn't agree . . . . [the word "both" is] not necessary." We find no reversible error in the text of the verdict slip.

Deutz also asks us to find that the evidence indicating an agreement to arbitrate was so overwhelmingly favorable to it that we should grant judgment in its favor on this point. We are not persuaded that the record supports Deutz's optimistic evaluation of the strength of its case, nor that we should reverse the jury's factual finding. "[J]ury verdicts can be overturned only if the record fails to contain the minimum quantum of evidence from which the jury could have rationally reached a verdict." Dutton v. Wolpoff & Abramson, 5 F.3d 649, 653 (3d Cir. 1993) (internal quotations omitted).

In sum, we find no error in the District Court's resolution on the issue of arbitrability. Moreover, although not controlling on us or the District Court, it is interesting that the ICC Panel, applying Swiss law, also held that Deutz was not entitled to arbitration. Focusing first on the provisions listed in Deutz's signature block and the fact that the

13

article establishing arbitration procedures did not mention Deutz, the Panel found the contract ambiguous.

Swiss law required the Panel to look to the parties' pre-contract history and other relevant circumstances. After considering Deutz's active participation in the negotiations, its refusal to add a reference to Article 7 in the signature block in spite of the attention this portion of the contract received during the final two weeks of negotiations, and the fact that all parties were assisted by lawyers, the Panel held that there was no arbitration agreement between Deutz and General Electric. It also observed that the outcome would not have been different had it adhered to one of the other possibly applicable national laws.

We also note in passing Deutz's contention that it is inconsistent to suggest that the company approached the status of Moteren-Werke's "alter ego" for the purposes of personal jurisdiction, but not in connection with the arbitration clause. This argument confuses two very different issues, the terms of the contract and Deutz's presence in Pennsylvania.

The fact that many Moteren-Werke officials were also high-ranking officers of Deutz is relevant to the personal jurisdiction analysis because the personal contacts these officials had with the forum state were made on behalf of both the parent company and its subsidiary. It is not the alter ego arrangement that gave the District Court personal jurisdiction over Deutz. Rather, it is the fact that Deutz officials -- in their own capacity as well as in that of managers of Moteren-Werke -- made frequent contact with General Electric in Pennsylvania for the purpose of discussing issues pertaining to Deutz's obligations under the contract.

On the other hand, the contract text distinguishes the obligations of Moteren-Werke and its parent company. The interrelationship of the Deutz and Moteren-Werke officers simply does not alter their contractual arrangement and the obligations to which each company agreed.4

_____

4. We note that in certain circumstances, some Courts of Appeals have applied the principle of equitable estoppel to permit non-signatories to

IV.

THE INJUNCTION

As noted earlier, while the parties were litigating in
Pennsylvania, Deutz initiated an arbitration proceeding
before the International Chamber of Commerce Court of
Arbitration in July 1999. Despite General Electric's
objections, the ICC assembled a panel of arbitrators to
consider the jurisdictional issue.

After the ICC Panel set a schedule for its proceedings,
Deutz applied to the Queen's Bench Division of the High
Court in London for an order restraining General Electric
from seeking an injunction in the District Court in
Pennsylvania against Deutz proceeding before the ICC.

Justice Thomas of the High Court, in a judgment dated
April 14, 2000, dismissed the request. He emphasized that
in the posture of the matter before the Court that he was
"not in any way finally deciding the point." Nonetheless, it
appeared that "the words by which Deutz became a party to
the agreement [did] not establish a serious issue to be tried
on the question of whether [it] became a party to the
arbitration clause."

The High Court also recognized that each party had been
given a full opportunity to produce evidence in the District

_____

enforce arbitration agreements against signatories to various contracts.
See, e.g., Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524 (5th
Cir. 2000); Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d
753
(11th Cir. 1993); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,
863 F.2d 315 (4th Cir. 1988); Hughes Masonry Co., Inc. v. Greater Clark
County Sch. Bldg. Corp., 659 F.2d 836 (7th Cir. 1981). But see Grigson,
210 F.3d at 531-40 (Dennis, J., dissenting). This Court has noted that
line of cases, although their reasoning was factually inapplicable to the
case before us. See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber
& Resin Intermediates, S.A.S., No. 00-3550, 2001 WL 1229797 (3d Cir.
Oct. 15, 2001). Deutz, however, did not raise the theory of equitable
estoppel in the District Court or on appeal, and we therefore do not
consider whether we would apply that doctrine in this case. See First
Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995); Dayhoff Inc. v.
H.J. Heinz Co., 86 F.3d 1287 (3d Cir. 1996).

15

Court, which had applied principles similar to those adhered to by the Queen's Bench. Finally, Justice Thomas remarked that Deutz would be able to assert its contentions in the forthcoming District Court proceedings, particularly the argument that comity should inform the deference to be accorded the jurisdiction of the ICC Panel. In the meantime, the ICC Panel continued to receive memorials and expert opinions from the parties bearing on the jurisdictional question.

After argument and further briefing, the District Court, citing its authority to enjoin parties from pursuing parallel litigation in foreign as well as domestic courts, issued an order on July 31, 2000, "permanently enjoin[ing] Deutz from appealing the forthcoming jurisdictional order of the Arbitral Tribunal to the English courts or from taking any other action in furtherance of its prosecution of the ICC arbitration." Because the parties had purportedly completed their submissions to the arbitration panel, and nothing remained but the issuance of a decision, the Court limited its order, enjoining Deutz from appealing the ICC ruling to the English courts or taking further steps in arbitration thereafter.

The District Court acknowledged that its injunctive power must be exercised sparingly; parallel proceedings are ordinarily permitted to proceed simultaneously, at least until one has reached the stage where its ruling becomes res judicata. Recognizing that an intercircuit split has developed over the degree of deference owed foreign courts, the District Court concluded that the better approach emphasizes international comity. Using this standard, it would issue an injunction only if res judicata applied, or if the foreign proceeding threatened the Court's jurisdiction over the matter at hand or a strong public policy of the United States.

The District Court first considered whether its February 28, 2000 order incorporating the jury verdict that found the dispute non-arbitrable was sufficiently final to serve as the basis of res judicata. Relying on Towers, Perrin, Forster & Crosby, Inc. v. Brown, 732 F.2d 345 (3d Cir. 1984), the Court concluded that: "[O]ur order is clearly final and conclusive in the sense that the issue will not be relitigated

16

in this Court during the proceedings on the merits of [ ] General Electric's breach of contract claim."

Even if this were not the case, the Court concluded in the alternative that the ICC proceeding posed a threat to its jurisdiction, reasoning that "if the Tribunal were to decide that the parties did agree to arbitrate, it would in effect be declaring that it had jurisdiction and this Court does not." Finally, the Court found that preserving the sanctity of the jury verdict was an important public policy of the United States, and was made vulnerable by a potential ICC finding that the case belonged in arbitration.

We are persuaded that none of the bases relied upon by the District Court supports the issuance of an injunction in this case, and will discuss each of them in turn.

First, res judicata or claim preclusion 5 is designed to avoid piecemeal litigation of claims arising from the same events. The determination of whether two suits are based on the same cause of action turns on the essential similarity of the underlying events giving rise to the various legal claims. Generally speaking, claim preclusion or res judicata requires a final judgment on the merits in a prior suit involving the same parties or their privies, and a subsequent suit based on the same cause of action. Churchill v. Star Enters., 183 F.3d 184, 194 (3d Cir. 1999); see also Gregory v. Chehi, 843 F.2d 111 (3d Cir. 1988) (describing generally the principles of res judicata). The party seeking to take advantage of claim preclusion has the burden of establishing it. United States v. Athlone Indus., Inc., 746 F.2d 977, 983 (3d Cir. 1984).

_____

5. Courts and commentators have used varying terminology, often referred to collectively as "res judicata," in discussing the preclusive effects of prior adjudication. Today, however, res judicata is sometimes used to represent two distinct preclusion concepts,"issue preclusion" and "claim preclusion." While the former refers to the effect of a judgment in foreclosing further adjudication of a matter actually decided, claim preclusion prohibits litigants from pursuing a matter that has not previously been litigated but which should have been advanced in an earlier suit. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 77 n.1 (1984).

17

Res judicata is commonly, and properly, pleaded as an affirmative defense in a second suit arising out of the same injury. See Churchill, 183 F.3d at 189. Only in aggravated circumstances may the court presiding over the first case anticipate the second by entering an injunction against initiation of further proceedings; the tendency to issue such injunctions should almost always be avoided. The judicial consensus is ably summarized by Wright and Miller in their treatise:

> "However tempting it may be for a court to conclude that it is in the best position to assess the preclusive effects of its own judgments, application of preclusion principles requires familiarity not only with the first judgment but also with the subsequent proceedings. The first court should not lightly usurp the jurisdiction of another court to dispose of pending litigation."

18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. S 4405, at 41-42 (1981).

In the case before us, only the interlocutory orders finding personal jurisdiction and dismissing Deutz's arbitration request have been entered. General Electric's claims against Deutz for damages have not been resolved. Although the order denying arbitration was appealable, see 9 U.S.C. S 16(a); 28 U.S.C. S 1292(a)(1), Deutz had not yet taken an appeal at the time the District Court entered its injunction.

In Towers, defendants appealed the California trial court's dismissal of their petition to compel arbitration. 723 F.2d at 346. Before the appeal was decided, they filed suit in federal court in Pennsylvania, seeking an order compelling arbitration over the same dispute. While the federal action was pending, the California appellate court affirmed the order denying arbitration. Despite that ruling, the federal district court granted the petition for arbitration and stayed the California proceedings. Id. at 346-47.

We reversed the district court's order, observing that under California law, the arbitration issue could be considered separately from the merits and that the state appellate court had affirmed the ruling of non-arbitrability. In those circumstances, the California order was res

judicata. Accordingly, we barred the federal district court from proceeding further. Id. at 348-50; see also Moses H. Cone Mem'l Hosp., 460 U.S. at 10 (stay of later-filed federal suit pending resolution of state suit precluded further litigation in federal forum; state court's judgment would, therefore, be res judicata). Our Court explicitly declined to discuss the controlling rule where a federal court issues the prior order. Towers, 732 F.2d at 350 n.2.

Although the Towers case is generally cited for the proposition that a state court's order denying arbitration may be treated as final for res judicata purposes, it is not irrelevant that the order had already been affirmed on appeal when the District Court came to a contrary conclusion. One reason we found the California trial court's order to be sufficiently final was that it was "free from attack on appeal. The determination of non-arbitrability [was] upheld on direct appeal and could not be reviewed again on appeal from a determination of the merits of the dispute." Id. at 349 (internal quotations and citations omitted).

Furthermore, even if Towers supports a finding of res judicata in this case, it does not necessarily follow that an injunction should issue. In that case, we reviewed an order denying arbitration entered by a trial court in another system. Here, on the other hand, the District Court relied on its own order, as yet unappealed, to preclude litigation in another forum.

"Anticipatory" injunctions, issued before the subsequent suit is under way, are to be used in the rarest of circumstances on the domestic front. In view of the international reach of the injunction, the District Court should have left the res judicata effect of its order to the determination of the other forum. The District Court's determination that its order was sufficient for res judicata purposes would not necessarily be binding on English courts.

The circumstances here were not so aggravated as to justify interference with the jurisdiction of the courts of another sovereign state, and there is no indication that the English courts would have prevented General Electric from

19

arguing the res judicata effect of the February 28, 2000 order.

General Electric argues that if Deutz had not been so restrained, it might have destroyed the District Court's jurisdiction by securing an order from the High Court compelling arbitration. The record, however, reveals little basis for such qualms. Deutz petitioned the High Court two months after the District Court had dismissed the arbitration request, and the High Court declined to issue an injunction restraining General Electric from proceeding in the federal court, voicing serious doubts about the strength of Deutz's position. Thus, the District Court knew before it enjoined Deutz that the High Court had shown no inclination to disagree with the non-arbitrability ruling.

Similarly ill-founded is General Electric's assertion that the sanctity of the jury verdict would be jeopardized by permitting Deutz to repair once again to the High Court in London. Although the jury unquestionably has a more important role in the American jurisprudential system than in that of any other nation, its verdict is neither infallible nor immune from judicial scrutiny.

We have been cited to no authority that endorses enjoining proceedings in a foreign court on the grounds that an American jury verdict might be called into question. Indeed, in denying Deutz's application, the High Court took pains to mention that the findings of fact had been made by a jury. There is little reason to believe that the High Court would give any less deference to the jury's role as fact-finder if the issue were presented a second time.

V.

COMITY

In parallel litigation, the issue of comity is an important and omnipresent factor. Although it is a consideration in federal and state litigation, it assumes even more significance in international proceedings. The Supreme Court has described comity as "the recognition which one nation allows within its territory to the legislative, executive

20

or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." Hilton v. Guyot, 159 U.S. 113, 164 (1895); see also Somportex, Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971) (describing comity as a rule of "practice, convenience, and expediency").

The Court of Appeals for the D.C. Circuit has described comity as a "complex and elusive concept," the deference a domestic court should pay to the actions of a foreign government, not otherwise binding on the forum. Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C. Cir. 1984). The primary reason for giving effect to the rulings of foreign tribunals is that such recognition factors international cooperation and encourages reciprocity. Thus, comity promotes predictability and stability in legal expectations, two critical components of successful international commercial enterprises. It also encourages the rule of law, which is especially important because as trade expands across international borders, the necessity for cooperation among nations increases as well. Id.

The Supreme Court has taken to task American courts that have demonstrated unduly narrow attitudes in this area:

> "The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts. . . . We cannot have trade and commerce in world markets and international waters on our terms, governed by our laws, and resolved in our courts."

THE BREMEN v. Zapata Off-Shore Co., 407 U.S. 1, 9 (1972).

In another case emphasizing world economic interdependence, the Court of Appeals for the Sixth Circuit noted that the proper exercise of comity demonstrates confidence in the foreign court's ability to adjudicate a dispute fairly and efficiently. Gau Shan Co., Ltd. v. Bankers Trust Co., 956 F.2d 1349, 1355 (6th Cir. 1992). Failure to

21

accord such deference invites similar disrespect for our judicial proceedings. Reciprocity and cooperation are worthy goals of comity. Id.

The federal Courts of Appeals have not established a uniform rule for determining when injunctions on foreign litigation are justified. Two standards, it appears, have developed. Courts following the "liberal" or"lax" standard will issue an injunction where policy in the enjoining forum is frustrated, the foreign proceeding would be vexatious or would threaten a domestic court's in rem or quasi in rem jurisdiction or other equitable considerations, and finally, where allowing the foreign proceedings to continue would result in delay. The Courts of Appeals for the Fifth, Seventh, and Ninth Circuits generally apply this standard.6

By contrast, the Second, Sixth and District of Columbia Circuits use a more restrictive approach, rarely permitting injunctions against foreign proceedings.7  These courts approve enjoining foreign parallel proceedings only to protect jurisdiction or an important public policy. Vexatiousness and inconvenience to the parties carry far less weight.

Our Court is among those that resort to the more restrictive standard. In Compagnie des Bauxites de Guinea v. Insurance Co. of North America, 651 F.2d 877, 887 (3d Cir. 1981), we reversed the grant of an injunction against parties seeking to initiate parallel litigation in the United Kingdom and concluded that parallel in personam  actions should be allowed to proceed in foreign as well as domestic cases. Id. The fact that the District Court in that case found the English proceeding would be harassing and vexatious was not enough to justify an injunction. Id.

We took a similarly restrictive approach in Republic of

_____

6. See Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 626–28 (5th Cir. 1996); Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 10 F.3d 425, 431–32 (7th Cir. 1993); Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League, 652 F.2d 852, 856 (9th Cir. 1981).

7. See Gau Shan Co., 956 F.2d at 1354–59; China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 36 (2d Cir. 1987); Laker Airways, 731 F.2d at 937–45.

Philippines v. Westinghouse Electric Corp., 43 F.3d 65 (3d Cir. 1995). There, the Philippine government filed suit as plaintiff in the United States District Court for the District of New Jersey. During the litigation, that government was alleged to have taken punitive measures against its own citizens who had testified adversely to it in the proceedings. The District Court enjoined the Philippine government from engaging in this harassment. 43 F.3d at 67-71.

Despite the aggravated nature of that government's alleged action, we reversed the grant of an injunction. Conceding that the District Court had the power to enjoin the Philippine government as it did, we concluded that the remedy was, nevertheless, extraordinarily intrusive into the activities of a government within its own territory and involving its own citizens. Id. at 80-81. The injunction violated fundamental notions of comity and, accordingly, it was vacated. Id. at 74-81; see also Remington Rand Corp.-Del. v. Bus. Sys. Inc., 830 F.2d 1260, 1272-74 (3d Cir. 1987) (order imposing constructive trust on bankrupt Dutch corporation's assets wherever located substantially impaired bankruptcy trustee's ability to perform duties under Dutch bankruptcy law, thereby offending principles of comity); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1296 (3d Cir. 1979) ("When foreign nations are involved, . . . it is unwise to ignore the fact that foreign policy, reciprocity, comity, and limitations of judicial power are considerations that should have a bearing on the decision to exercise or decline jurisdiction.").

Our jurisprudence thus reflects a serious concern for comity. This Court may properly be aligned with those that have adopted a strict approach when injunctive relief against foreign judicial proceedings is sought. Although it recognized our adherence to that restrictive standard, the District Court in this case invoked the threat to jurisdiction and violation of public policy factors to justify the injunction. As we noted earlier, the evidence supporting application of these factors was extremely weak, and any doubts to the contrary should have been put to rest by the High Court's judgment, issued before the injunction was granted.

23

The High Court's Justice Thomas commented with respect to General Electric's request for an injunction, then pending in the District Court:

> "He [the district judge] will no doubt take into account . . . that he, as a judge of the United States Court, is being asked to exercise extraordinary extra-territorial jurisdiction over an arbitral tribunal sitting in London within the jurisdiction of this Court. He will no doubt pay high regard to issues of comity, just as this Court has paid high regard to issues of comity in relation to the decisions made by him."

High Ct. Op. at 26.

At another point in his judgment, concluding that there was no serious issue of arbitrability, Justice Thomas observed, "It seems to me very difficult to see on what basis this Court should intervene in a proceeding so far advanced in the United States, where that particular issue has already been determined against Deutz." Id . at 30.

Assuming arguendo that the District Court's order denying arbitration can constitute a ruling that is final for res judicata purposes before its disposition on appeal, it does not follow that there is a sufficient basis for enjoining the proceedings in the English courts. This is not an aggravated case that calls for extraordinary intervention, nor is it sufficient that the ruling of the arbitral panel might have jeopardized the District Court's jurisdiction.

We do, of course, have a considerable advantage over the District Court, because the ICC Panel has now agreed that the case was not arbitrable. Although that decision colors our ruling, it does not weaken our conclusion, arrived at independently, that the District Court lacked sufficient grounds to grant the injunction. We are also confident that there was no serious threat to an important public policy because of the happenstance that essential fact finding in the District Court was performed by a jury rather than by the judge.

The Order granting the injunction will be reversed. In all other respects, we will affirm the Orders of the District Court.

24

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit