

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-26-2003

# China Minmetals v. Chi Mei Corp

Precedential or Non-Precedential: Precedential

Docket No. 02-2897

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"China Minmetals v. Chi Mei Corp" (2003). *2003 Decisions.* Paper 397.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/397

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 26, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 02-2897 and 02-3542

CHINA MINMETALS MATERIALS IMPORT
AND EXPORT CO., LTD.

v.

CHI MEI CORPORATION,

*Appellant*

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 01-03481)
Honorable Dennis M. Cavanaugh, District Judge

Argued April 7, 2003

BEFORE: ALITO, FUENTES, and GREENBERG,
*Circuit Judges*

(Filed: June 26, 2003)

J. Jeffrey Weisenfeld (argued)
401 Broadway, Suite 306
New York, NY 10013
*Attorney for Appellee*

David L. Braverman
Robert C. Seiger, III, Esq.
Richard E. Miller (argued)
Braverman Kaskey & Caprara
One Liberty Place, 21st Floor
Philadelphia, PA 19103

*Attorneys for Appellant*

## OPINION OF THE COURT

GREENBERG, *Circuit Judge.*

This matter comes on before this court on an appeal by the Chi Mei Corporation ("Chi Mei") from the district court's order entered June 11, 2002, granting the motion of China Minmetals Import & Export Co. ("Minmetals") to confirm and enforce a foreign arbitration award and from the judgment entered on August 26, 2002, in favor of Minmetals and against Chi Mei in the amount of $4,040,850.41. For the reasons stated herein, we will vacate the district court's order and judgment and will remand the case for further proceedings.

## I. BACKGROUND

Chi Mei is a New Jersey corporation and Minmetals is a corporation formed and existing under the laws of the People's Republic of China ("PRC").[1] Production Goods and Materials Trading Corp. of Shantou S.E.Z. ("Shantou"), which also is implicated in this action, likewise is a corporation formed and existing under the laws of the PRC.

This dispute arises out of a transaction involving Chi Mei, Minmetals, and Shantou. The parties dispute almost every detail of the transaction; for example, Chi Mei refers to it as a "currency conversion transaction"[2] while Minmetals calls

---

1. Inasmuch as the district court enforced the arbitration award without opinion, it did not explicitly find any facts in this case. Nevertheless, the facts we summarize are undisputed except as noted.

2. The PRC imposes strict restrictions on foreign currency transactions, allowing only authorized parties to convert PRC currency ("RMB") into United States dollars.

it a contract for purchase by Minmetals of electrolytic nickel cathode. Moreover, we do not find the parties' descriptions of the transactions to be completely clear, a problem that fortunately does not impede our ability to decide this case. Chi Mei argues that it never intended nor agreed to sell anything to Minmetals and alleges that the contracts on which Minmetals relies were forged. On the other hand, Minmetals argues that Chi Mei failed to deliver the goods it promised to sell after receiving payment by drawing on a line of credit of several million dollars.

According to Chi Mei, on or about June 12, 1997, Shantou sought out Chi Mei to discount a certain sum of US dollars. J.A. at 119.[3] Chi Mei orally agreed to provide discounting services for a .7% commission of the amount of US dollars before discount. Minmetals was to obtain the funds by way of a letter of credit obtained from the Bank of China, as the PRC apparently authorized Minmetals to engage in currency conversion transactions. Chi Mei asserts, however, that Shantou did not disclose its relationship with Minmetals to it and that it was unaware of Minmetals' role in the transaction until after the delivery of the proceeds of the letter of credit to Shantou. Chi Mei subsequently was to transfer the funds to accounts Shantou designated, and Chi Mei did so. By contrast, Minmetals asserts that the transaction involved an agreement to purchase electrolytic nickel cathode alloy, it issued letters of credit worth several million dollars to Chi Mei, and Chi Mei knowingly submitted to a New York bank numerous false documents evidencing the sale, including an invoice, weight packing list, quality certificate, and bill of lading, in order to collect funds under the letters of credit. Minmetals contends that Chi Mei did not deliver the goods described in the contracts.

Two contracts submitted to a bank in the PRC that purport to be contracts for the sale of nickel by Chi Mei to

---

3. Chi Mei sets forth its version of the facts primarily in the affidavit of Jiaxiang Luo, its president during the relevant period, which it submitted to the district court in opposition to Minmetals' motion to enforce and in support of Chi Mei's motion to dismiss. *See* J.A. at 115-26.

Minmetals for a sum equal to the amount of the letters of credit (the "Sale of Goods contracts") are central to this dispute. Chi Mei alleges that the two contracts were entirely fraudulent, containing a forged signature of a nonexistent Chi Mei employee as well as a forged corporate stamp. Chi Mei further alleges that it was unaware of the existence of these contracts until it appeared at the arbitration that is the subject of this dispute. The contracts provide for binding arbitration of any disputes in connection with the contracts before the China International Economic and Trade Arbitration Commission ("CIETAC"). App. at 33.

According to Chi Mei, it performed its duties under the oral agreement governing the currency discounting transaction and delivered the funds to Shantou after collecting its .7% commission.[4] Shantou then allegedly misappropriated the funds, refusing to remit any of them to Minmetals.[5]

On or about November 14, 1997, Minmetals initiated an arbitration proceeding before CIETAC against Chi Mei pursuant to the arbitration clauses contained in the Sale of Goods contracts.[6] Chi Mei repeatedly objected to CIETAC's jurisdiction but, nevertheless, appeared before it, submitting evidence that the contracts which contained the arbitration clause on which Minmetals relied were forged. Chi Mei also argued that Minmetals' flouting of Chinese law should prevent its recovery in the arbitration. *Id.* at 44-45.

4. At oral argument on the appeal, counsel for Chi Mei suggested for the first time that insofar as there may have been some agreement to sell goods, that agreement involved a company called Hexin (Far East) Development Ltd., not Chi Mei. This alternative argument does not affect our analysis in this opinion.

5. Chi Mei indicates that Minmetals filed criminal complaints in the PRC against Chi Mei and Shantou. Chi Mei was exonerated after a formal inquiry by the Beijing Police Department, which did not result in a criminal charge, while Weizhe Lin, the president of Shantou, was convicted of the criminal offense of conversion in connection with this matter. *Id.* at 122.

6. According to Jiaxiang Luo, the Chi Mei president, the contracts submitted by Minmetals to CIETAC were in fact different from the two contracts presented to the Bank of China. App. at 124-25. According to him, all four contracts were forged and fraudulent. *Id.*

The arbitration tribunal held that Chi Mei failed to meet its burden of showing that the contracts at issue were forged, and that even if Chi Mei's signature and stamp had been forged, its actions, such as providing documents to the New York bank and drawing on the letters of credit, constituted "confirmation of the validity of the contracts." *Id.* at 49. On August 30, 2000, the CIETAC panel awarded Minmetals an amount in excess of $4 million.

In July 2001, Minmetals moved in the district court for an order confirming and enforcing the arbitration award. Chi Mei opposed the motion and filed a cross-motion to deny the relief Minmetals sought, submitting numerous documents and affidavits, including the affidavit of Jiaxiang Luo, the Chi Mei president. Minmetals did not submit any contrary affidavits. The district court heard oral argument on the motions and, without conducting an evidentiary hearing, on June 11, 2002, entered an order granting Minmetals' motion to confirm and enforce the award and denying Chi Mei's cross-motion. The court, however, did not file an opinion explaining its decision and, accordingly, we do not know the basis for its entry of the order. On August 26, 2002, the district court entered judgment in favor of Minmetals in the amount of $4,040,850.41. This appeal followed.

## II.  JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 9 U.S.C. § 203 and 28 U.S.C. § 1331, and we have jurisdiction pursuant to 28 U.S.C. § 1291.[7] Ordinarily, in reviewing a district court's order confirming an arbitration award, we would review the district court's factual findings for clear error and its legal conclusions *de novo*. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947-48, 115 S.Ct. 1920, 1926 (1995). Here, however, inasmuch as the court,

---

7. Chi Mei filed two notices of appeal, the first following the June 11, 2002 order and the second following entry of the judgment. Because the second notice of appeal supplies a jurisdictional basis for us to consider all the issues, we need not consider the effect of the first notice of appeal. *See Livera v. First Nat'l State Bank*, 879 F.2d 1186, 1190 (3d Cir. 1989).

at least explicitly, did not make findings of fact, and we, in any event, are deciding the case on a legal basis, our entire review is plenary.

## III.  DISCUSSION

### A.  FORGERY ALLEGATIONS

The primary issue in this case is whether the district court properly enforced the foreign arbitration panel's award where that panel, in finding that it had jurisdiction, rejected Chi Mei's argument that the documents providing for arbitration were forged so that there was not any valid writing exhibiting an intent to arbitrate. This issue actually involves two distinct questions. First, we must consider whether a foreign arbitration award might be enforceable regardless of the validity of the arbitration clause on which the foreign body rested its jurisdiction. In this regard, Minmetals points out that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") differs somewhat from the general provisions of the Federal Arbitration Act ("FAA"), and particularly argues that Article V of the Convention requires enforcement of foreign awards in all but a handful of very limited circumstances, one of which is not the necessity for there to be a valid written agreement providing for arbitration. If we conclude, however, that only those awards based on a valid agreement to arbitrate are enforceable, we also must consider who makes the ultimate determination of the validity of the clause at issue. Thus, in considering the second question, we must examine the district court's role, if any, in reviewing the foreign arbitral panel's finding that there was a valid agreement to arbitrate.

9 U.S.C. § 207 provides:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

The Convention is incorporated into the FAA in 9 U.S.C. § 207 and appears at 9 U.S.C.A. § 201 historical n. Article V of the Convention provides:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

. . . .

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

. . . .

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

Article IV establishes the procedure for seeking enforcement of an award under Article V:

1. To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforcement shall, at the time of the application, supply:

(a) The duly authenticated original award or a duly certified copy thereof;

(b) The original agreement referred to in article II or a duly certified copy thereof.

. . . .

Article II provides:

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

3. The court of a Contracting State, when seized of an action in a matter in respect to which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

Minmetals argues that each article of the Convention governs a different aspect of arbitration procedure—Article II sets forth the grounds for compelling arbitration, Article IV describes the procedure required for seeking

enforcement of an award, and Article V provides that once an award is made, the courts of a contracting state must enforce that award unless one of the narrow grounds for nonenforcement is proven. This case, according to Minmetals, therefore involves only Article V, under which in its view "the requirement of a valid written agreement is not necessary for enforcement." Appellee's Br. at 6. Chi Mei, on the other hand, argues that the Convention must be read as a whole and that Article V both explicitly and implicitly incorporates Article II's valid written agreement requirement. In addition, Minmetals argues that the arbitration panel's decision as to the validity of the arbitration agreement is conclusive unless an Article V exception applies, which, it argues, is not the case here. Chi Mei, for its part, argues that the district court had an obligation to determine independently the validity of the agreement.

Because the domestic FAA (chapter 1 of the FAA) is applicable to actions brought under the Convention (chapter 2 of the FAA) to the extent they are not in conflict, 9 U.S.C. § 208, Chi Mei relies heavily on the Supreme Court's decision in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920. *First Options* involved the domestic FAA, not the Convention, but involved facts similar to those in this case. In *First Options*, as here, the district court confirmed an arbitration award where the parties against whom the award was enforced had argued both in the arbitration proceedings and before the district court that they had not signed the document containing the arbitration clause. *Id.* at 941, 115 S.Ct. at 1922. In that case, the Court held that the district court and not the arbitration panel must decide the question of arbitrability— that is, the question whether a certain dispute is subject to arbitration under the terms of a given agreement—unless the parties clearly and unmistakably have agreed that the arbitrator should decide arbitrability. *Id.* at 943, 115 S.Ct. at 1923-24. In other words, the Court, relying on the principle that "a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration," *id.* at 945, 115 S.Ct. at 1925, held that, unless the district court found that there was clear and unmistakable evidence that the parties agreed to arbitrate arbitrability,

the district court independently must determine whether the parties agreed to arbitrate the merits of the dispute, *id.* at 943-45, 115 S.Ct. at 1923-25.

Chi Mei therefore argues that, under *First Options*, the district court should have concluded that the parties did not agree to arbitrate arbitrability[8] and, faced with the evidence presented by Chi Mei in opposition to enforcement and the lack of evidence submitted in response by Minmetals, the district court should have found that the dispute was not arbitrable because the contract had been forged, or at least should have conducted a hearing to resolve that issue. If this case had arisen under the domestic FAA, *First Options* clearly would have settled in Chi Mei's favor both the question of the need for a valid agreement to arbitrate and the question of the district court's role in reviewing an arbitrator's determination of arbitrability when an award is sought to be enforced. We, therefore, must determine whether *First Options* provides the rule of decision in a case involving enforcement of a foreign arbitration award under the Convention.

Our cases involving enforcement under the Convention largely have arisen under Article II, with one party seeking an order compelling another party to arbitrate a dispute. Under those cases, it is clear that if Minmetals had initiated proceedings in the district court to compel arbitration, the court would have been obligated to consider Chi Mei's allegations that the arbitration clause was void because the underlying contract was forged. *See Sandvik v. Advent Int'l Corp.*, 220 F.3d 99, 104-07 (3d Cir. 2000). It is, of course, true that the FAA, of which the Convention is a part, establishes a strong federal policy in favor of arbitration and that the presumption in favor of arbitration carries " 'special force' " when international commerce is involved. *Id.* at 104 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 3356 (1985)). Nonetheless, we have stated that the " 'liberal federal policy favoring arbitration agreements . . . is at bottom a policy guaranteeing the enforcement of private

---

8. Minmetals does not point to any evidence supporting a conclusion that the parties manifested an intent to arbitrate arbitrability.

contractual arrangements,'" *id.* at 105 (quoting *Mitsubishi*, 473 U.S. at 625, 105 S.Ct. at 3353), and that because "arbitration is a matter of contract, . . . no arbitration may be compelled in the absence of an agreement to arbitrate," *id.* at 107-08 (citing *AT&T Techs, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418 (1986)).

In *Sandvik*, we affirmed the district court's denial of a motion to compel arbitration where the district court had concluded that it had to determine whether the parties in fact had entered into a binding agreement to arbitrate before it could compel arbitration. *Id.* at 104-07. In that case, there was a dispute as to whether the agreement containing the arbitration agreement was binding on the defendant corporation where it alleged that its attorney signed the contract without proper authorization. *Id.* at 101-02. We relied on our decision in *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51 (3d Cir. 1980), in which we stated:

> Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect. If there is doubt as to whether such an agreement exists, the matter, upon a proper and timely demand, should be submitted to a jury. Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement.

*Id.* at 106 (quoting *Par-Knit Mills*, 636 F.2d at 54).

In *Sandvik*, we drew a distinction between contracts asserted to be void or nonexistent, as was the case there and is the case here, and contracts alleged to be voidable, in which case arbitration, including arbitration of the fraud question, may be appropriate under *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801 (1967).[9]

---

9. In *Prima Paint,* the plaintiff brought an action to rescind a contract with the defendant on the basis of fraud in the inducement. The defendant moved to arbitrate the dispute on the basis of an arbitration clause contained in the contract alleged to have been induced fraudulently. The Supreme Court held that the arbitrator should decide the challenge based on fraud in the inducement of the entire contract. *Prima Paint*, 388 U.S. at 403-04, 87 S.Ct. at 1806.

We concluded that "[b]ecause under both the [Convention] and the FAA a court must decide whether an agreement to arbitrate exists before it may order arbitration, the District Court was correct in determining that it must decide whether [the attorney's] signature bound Advent before it could order arbitration." *Id.* at 107; *see also Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 152-56 (3d Cir. 2001) (affirming district court's decision in case to compel an international arbitration to submit arbitrability question to jury after finding arbitration clause's application to defendant ambiguous). Notably, although we supported our conclusion with references to the "null and void" language in Article II of the Convention, we based our decision on straightforward notions of contract law rather than on any technical interpretation of the language of the treaty. *See Sandvik*, 220 F.3d at 105-10.

In this case, however, an arbitral tribunal already has rendered a decision, and has made explicit findings concerning the alleged forgery of the contract, including the arbitration clause. "The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15, 94 S.Ct. 2449, 2457 n.15 (1974). In an oft-cited opinion concerning enforcement of a foreign arbitration award, the Court of Appeals for the Second Circuit noted the "general pro-enforcement bias informing the Convention," explaining that the Convention's "basic thrust was to liberalize procedures for enforcing foreign arbitral awards." *Parsons & Whittemore Overseas Co. v. Societe Generale de l'Industrie du Papier*, 508 F.2d 969, 973 (2d Cir. 1974).

Consistently with the policy favoring enforcement of foreign arbitration awards, courts strictly have limited defenses to enforcement to the defenses set forth in Article V of the Convention, and generally have construed those exceptions narrowly. *See, e.g.*, *id.* at 973-77; *see also Biotronik Mess-und Therapiegeraete GmbH & Co. v. Medrord*

*Med. Instrument Co.*, 415 F. Supp. 133, 136, 140-41 (D.N.J. 1976). As the Court of Appeals for the Second Circuit has noted, "[t]here is now considerable caselaw holding that, in an action to confirm an award rendered in, or under the law of, a foreign jurisdiction, the grounds for relief enumerated in Article V of the Convention are *the only* grounds available for setting aside an arbitral award." *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys 'R' Us, Inc.*, 126 F.3d 15, 20 (2d Cir. 1997) (emphasis added) (citing *M&C Corp. v. Erwin Behr GmbH & Co.*, 87 F.3d 844, 851 (6th Cir. 1996); *Int'l Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Industrial y Comercial*, 745 F. Supp. 172, 181-82 (S.D.N.Y. 1990); *Brandeis Intsel Ltd. v. Calabrian Chems. Corp.*, 656 F. Supp. 160, 167 (S.D.N.Y. 1987); Albert Jan van den Berg, The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation 265 (1981)).

This narrow interpretation of the Convention is in keeping with 9 U.S.C. § 207 which unequivocally provides that a court in which enforcement of a foreign arbitration award is sought "*shall confirm* the award *unless it finds one of the grounds* for refusal or deferral of recognition or enforcement of the award *specified in the said Convention.*" (emphasis added). The absence of a written agreement is not articulated specifically as a ground for refusal to enforce an award under Article V of the Convention. In fact, the Convention only refers to an "agreement in writing" in Article II, which requires a court of a contracting state to order arbitration when presented with an agreement in writing to arbitrate, unless it finds that agreement to be void, inoperative, or incapable of being performed. This distinction, according to Minmetals, is enough to differentiate this case from cases like *First Options*, which arose under the FAA,[10] as well as from cases like *Sandvik* and *Deutz*, which arose under Article II.

---

10. As Minmetals notes, the grounds for refusal to enforce an award are broader under the FAA than under the Convention. Furthermore, the FAA refers repeatedly to the need for a written agreement, *see MCI Telecommunications Corp. v. Exalon Indus., Inc.*, 138 F.3d 426, 429 (1st Cir. 1998) (citing numerous provisions of the FAA that refer to a "writing"

On the other hand, the crucial principles common to all of these decisions—that arbitration is a matter of contract and that a party can be forced to arbitrate only those issues it specifically agrees to submit to arbitration—suggest that the district court here had an obligation to determine independently the existence of an agreement to arbitrate even though an arbitration panel in a foreign state already had rendered an award, unless Minmetals' argument concerning the exclusive nature of Article V or some other principle provides a meaningful reason to distinguish the cases we have cited. Thus, we consider whether Convention cases cited by Minmetals, which contrast Article II with the stricter Article V, provide a compelling reason to distinguish this case from *Sandvik* and *Deutz*. Furthermore, there is some question whether the culture of international arbitration, which informs the structure, history, and policy of the Convention, provides a basis for distinguishing this case from *First Options*.

With regard to the first question, we are not convinced by *Slaney v. International Amateur Athletic Federation*, 244 F.3d 580 (7th Cir. 2001), or by *Yusuf Ahmed Alghanim*, both cited by Minmetals, that the absence from Article V of the lack of a valid written agreement as a ground for refusal to enforce an award is fatal to Chi Mei's contention that forgery of the arbitration agreement should preclude its enforcement. In *Slaney*, the Court of Appeals for the Seventh Circuit held that a foreign arbitration award should be enforced against the plaintiff despite her argument that there was not a valid "agreement in writing" as required by Article II of the Convention. The court explained:

---

and relying on that statutory language in holding that "determining whether there is a written agreement to arbitrate the controversy in question is a first and crucial step in any enforcement proceeding before a district court"), while the Convention does not. Neither of these distinctions in itself supplies a convincing reason to refuse to apply *First Options* to a case under the Convention, however, inasmuch as neither of these points played any role in the Supreme Court's analysis in *First Options*. The Court based its decision in that case largely on straightforward contract principles rather than on a technical statutory analysis.

Assuming that this case had come to the district court and the IAAF had sought to compel Slaney to arbitrate her claims, a determination as to whether there had been a writing might pose a barrier to the IAAF's position. However, that is not the case. Here, an arbitration has already taken place in which, as we have determined, Slaney freely participated. Thus, the fact that Slaney suggests there is no written agreement to arbitrate, as mandated by Article II of the New York Convention is irrelevant. *See, e.g., Coutinho Caro & Co., U.S.A., Inc. v. Marcus Trading Inc.*, Nos. 3:95CV2362 AWT, 3:96CV2218 AWT, 3:96CV2219 AWT, 2000 WL 435566 at *5 n.4 (D. Conn. March 14, 2000) (recognizing a difference between the situation where a party seeks to compel arbitration and a situation in which one attempts to set aside an arbitral award that has already been issued). What is highlighted here is the difference between Article II of the Convention, which dictates when a court should compel parties to an arbitration, and Article V, which lists the narrow circumstances in which an arbitration decision between signatories to the Convention should not be enforced.

*Id.* at 591. The court went on to apply ordinary rules of contract law in holding that the plaintiff was estopped from arguing that the lack of a binding written agreement precluded enforcement because she had participated freely in the arbitration proceeding, had not argued that she never agreed to the arbitration clause during those proceedings, and had let the opportunity to do so pass by when she withdrew from those proceedings. *Id.* The court also considered certain defenses to enforcement under Article V but rejected all of them. *Id.* at 592-94.

Minmetals relies on *Slaney* for the proposition that lack of a valid written agreement to arbitrate is irrelevant to enforcement under Article V, which neither mentions such an agreement nor explicitly incorporates the written agreement requirement of Article II. We, however, will not apply *Slaney* in the way Minmetals suggests. First, it appears that the language in *Slaney* suggesting that lack of a written agreement is irrelevant in an Article V case is

dicta. The court rested its decision primarily on an estoppel theory because Slaney had participated freely in the arbitration without arguing that lack of a written agreement to arbitrate deprived the arbitral tribunal of jurisdiction. *Id.* In applying estoppel principles, the court stated: "We see no reason why, even in the absence of a writing, ordinary rules of contract law should not apply." *Id.* In this case, as we discuss below, Chi Mei continually objected to the arbitration panel's jurisdiction and always has maintained that the purchase contracts were forged. Estoppel is therefore not applicable in this case. Moreover, the court in *Slaney* did not discuss *First Options* in considering Slaney's position with regard to the alleged lack of a written agreement to arbitrate.[11]

Minmetals' reliance on *Yusuf Ahmed Alghanim* likewise is misplaced. In that case, the court distinguished between awards rendered in a foreign state and awards rendered in the state in which enforcement is sought, holding that a court may consider implied grounds of relief under the FAA, such as the arbitrator's manifest disregard of the law, when asked to enforce an award rendered in the United States under the Convention. *Yusuf Ahmed Alghanim*, 126 F.3d at 20-23. The court stated:

> In sum, we conclude that the Convention mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made, and (2) in other states where recognition and enforcement are sought. The Convention specifically contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in

---

11. We do not suggest that the court's analysis was inconsistent with *First Options*. The Supreme Court explicitly stated that "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944, 115 S.Ct. at 1924. On the facts of *Slaney*, therefore, the court's conclusion that "non-signatories to an arbitration agreement may nevertheless be bound according to ordinary principles of contract and agency, including estoppel" was consistent with the Court's reasoning in *First Options*.

accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief. *See* Convention art. V(1)(e). However, the Convention is equally clear that when an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention.

*Id.* at 23.

At first blush, *Yusef Ahmed Alghanim* might appear to support Minmetals' position as it holds that awards rendered in a foreign state must be enforced unless one of the specific narrow exceptions in Article V is proven, while a United States court may refuse to enforce an award rendered in the United States or under United States law on other grounds implied under the FAA. *First Options* is, of course, a case under the FAA, and Minmetals suggests that it is therefore irrelevant here as the award in this case was made in a foreign state. *First Options*, however, did not involve an implied ground for relief under the FAA. Rather, it involved the more fundamental question of whether the party opposing enforcement was ever a party to a valid agreement to arbitrate. In *Yusuf Ahmed Alghanim*, there was no challenge to the validity of the arbitration agreement—only the arbitrator's interpretation of contract terms and application of New York law on lost profits were disputed. *Id.* at 23-25.

We therefore find that the absence of any reference to a valid written agreement to arbitrate in Article V does not foreclose a defense to enforcement on the grounds that there never was a valid agreement to arbitrate. Minmetals cannot point to any case interpreting Article V of the Convention so narrowly as to preclude that defense and we are aware of none.[12] Nor do the text and structure of the

---

12. At oral argument, counsel for Chi Mei for the first time urged that *Europcar Italia, SPA v. Maiellano Tours, Inc.*, 156 F.3d 310, 315-16 (2d Cir. 1998), provided direct support for its reading of the Convention. In that case, however, the party resisting enforcement did not argue that the agreement containing the arbitration clause (which was executed in 1988) was forged or fraudulent; rather, it argued that one of the agreements on which the arbitrators based their substantive decision

Convention compel such an interpretation. Indeed, although only Article II contains an "agreement in writing" requirement, Article IV requires a party seeking to enforce an award under Article V to supply "[t]he original agreement referred to in article II" along with its application for enforcement. Furthermore, Article V expressly provides that the party opposing enforcement may furnish "to the competent authority where the recognition and enforcement is sought proof that . . . the said agreement is not valid . . . ." Read as a whole, therefore, the Convention contemplates that a court should enforce only valid agreements to arbitrate and only awards based on those agreements. Thus, the concern we expressed in our decisions in Article II cases like *Sandvik* and *Deutz*—that parties only be required to arbitrate those disputes they intended to arbitrate—is likewise present in this case. We therefore hold that a district court should refuse to enforce an arbitration award under the Convention where the parties did not reach a valid agreement to arbitrate, at least in the absence of a waiver of the objection to arbitration by the party opposing enforcement.[13]

We therefore are left with the question whether the international nature of this case distinguishes it from *First Options*. Stated more precisely, we must ask whether the

_____

(which was executed in 1979) was forged. *Id.* The court therefore concluded that, inasmuch as the 1988 arbitration agreement explicitly provided that the arbitrators would decide disputes involving the validity of that agreement, the party resisting enforcement had the opportunity to raise the issue of forgery of the 1979 agreement during the arbitration proceedings, and, in any event, the existence of the 1979 agreement had only a minor influence on the arbitrators' substantive decision, enforcing the award would not violate public policy under Article V(2)(b). *Id.* Here, in the face of Chi Mei's argument that the contract containing the arbitration clause itself is forged *Europcar* is inapposite. We express no opinion as to the applicability of Article V(2)(b) to this case.

13. We do not, however, hold, as Chi Mei urges, that Article V "incorporates" Article II's valid written agreement requirement. In this respect, there is indeed some distinction between Article II and Article V. The former explicitly requires an "agreement in writing" while the latter requires only that the parties have reached an agreement as to arbitrability under ordinary contract principles.

international context of the arbitration at issue affects the principle that the district court should decide whether there was a valid agreement to arbitrate. As already noted, *First Options* held that, in a case arising under the domestic FAA, the district court independently should make that decision, even after the arbitrators have decided that they did have jurisdiction, absent clear and unmistakable evidence that the parties intended to leave that determination to the arbitrators.

Preliminarily on the issue it is worth noting that we previously have applied *First Options* in the international context, albeit in a case seeking to compel arbitration rather than to confirm an award. *See Deutz*, 270 F.3d at 155 ("We recognize that *First Options* is a domestic arbitration case, but the international nature of the present litigation does not affect the application of *First Options*' principles."). Furthermore, one district court in this circuit has refused to distinguish international arbitration proceedings from domestic arbitration proceedings, despite the greater presumption in favor of arbitration in the international context, in applying *First Options* to a case involving the Inter-American Convention on International Commercial Arbitration, which is implemented in Chapter 3 of the FAA, 9 U.S.C. § 301. *Am. Life Ins. Co. v. Parra*, 25 F. Supp. 2d 467, 474, 476 (D. Del. 1998).

There nonetheless may be reason to think that the international posture of this case removes it from the scope of *First Options*. For example, international arbitration rules tend to favor the rule of competence-competence (sometimes known as kompetenz-kompetenz)—the principle that gives arbitrators the power to decide their own jurisdiction—more than American arbitration rules.[14] One

---

14. Article 21 of the United Nations Commission on International Trade Law ("UNCITRAL") Rules of Arbitration states that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement." UNCITRAL Arbitration Rules Art. 21. The International Chamber of Commerce ("ICC") Rules of Arbitration allow a party that contests the existence, validity, or scope of an arbitration agreement to ask a court to decide

commentator has opined that "international arbitration rules normally provide explicitly that the arbitrators have the power to determine their own jurisdiction," so that agreements incorporating international arbitration rules fall within "the agreement of the parties exception of *First Options.*" Ian R. MacNeil et al., IV Federal Arbitration Law: Agreements, Awards And Remedies Under the Federal Arbitration Act § 44.15.1 (Supp. 1996) (quoted in *Parra*, 25 F. Supp. 2d at 476. *See also*, Conrad K. Harper, *The Options in* First Options*: International Arbitration and Arbitral Competence*, 771 PLI/Comm 127, 141-43 (1998) (noting that even prior to *First Options* some courts had held that by incorporating ICC Arbitration Rules into an arbitration agreement the parties clearly and unmistakably had authorized the arbitral tribunal to determine its own jurisdiction and arguing that incorporation of such rules is too often overlooked by the courts). *But see Parra*, 25 F. Supp. 2d at 476 (rejecting the suggestion that the parties clearly and unmistakably agreed to submit arbitrability disputes to the arbitral panel by submitting to an arbitration proceeding governed by Inter-American Commercial Arbitration Commission rules, which authorize arbitrators to resolve such disputes). The contracts in this case, for example, incorporate the rules of CIETAC. App. at 31. Those rules do indeed allow the arbitrators the power to determine their own jurisdiction. China International

---

whether a valid agreement exists; if the court so finds, then the arbitral tribunal rules on the arbitrability of the specific dispute before it. ICC Rules of Arbitration Art. 6(2). The Arbitration Rules of the International Center for Settlement of Investment Disputes ("ICSID") as well as the American Arbitration Association ("AAA") International Arbitration Rules likewise give arbitral tribunals the power to rule on their own jurisdiction, including objections with respect to the existence, scope, or validity of the arbitration agreement. ICSID Arbitration Rule 41(1); AAA International Arbitration Rules Art. 15. The London Court of International Arbitration ("LCIA") Rules go one step further, granting the arbitration tribunal the same power, and further providing that "[b]y agreeing to arbitration under these Rules, the parties shall be treated as having agreed not to apply to any state court or other judicial authority for any relief regarding the Arbitral Tribunal's jurisdiction or authority . . . ." LCIA Rules of Arbitration Art. 23.4.

Economic and Trade Arbitration Commission, Arbitration Rules Ch. I, § 1, Art. 4 ("The Arbitration Commission has the power to decide on the existence and validity of an arbitration agreement and on jurisdiction over an arbitration case."). Nonetheless, incorporation of this rule into the contract is relevant only if the parties actually agreed to its incorporation. After all, a contract cannot give an arbitral body any power, much less the power to determine its own jurisdiction, if the parties never entered into it.

Although incorporation of CIETAC rules in an allegedly forged contract is not enough in itself to require that Chi Mei be bound by the arbitration clause in this case, Minmetals nonetheless suggests that the international nature of this dispute is sufficient to distinguish this case from *First Options*. Thus, it could be argued that international norms favoring competence-competence, as well as American policy favoring arbitration particularly strongly in international cases, are sufficient to render *First Options* inapplicable in the international context. Competence-competence is applied in slightly different ways around the world. The one element common to all nations is the conferral of the power to decide jurisdiction on the arbitrators themselves. It is important to note, however, that this principle says nothing about the role of judicial review.

In its simplest form, competence-competence simply means that the arbitrators can examine their own jurisdiction without waiting for a court to do so; if one side says the arbitration clause is invalid, there is no need to adjourn arbitration proceedings to refer the matter to a judge. William W. Park, *Determining Arbitral Jurisdiction: Allocation of Tasks Between Courts and Arbitrators*, 8 Am. Rev. Int'l Arb. 133, 140 (1997). Under this brand of competence-competence, however, the arbitrators' jurisdictional decision is subject to judicial review at any time before, after, or during arbitration proceedings, as was traditionally the case under English law. *See id.* at 140 & n.22. The French form of competence-competence goes somewhat further. A court only can decide arbitrability before an arbitral panel has been constituted if the alleged

arbitration agreement is clearly void; otherwise, courts must decline to hear the case until after an arbitral award is rendered. *Id.* at 141. Finally, the strictest form of competence-competence is the traditional German kompetenz-kompetenz, under which an arbitral panel's jurisdictional decision in a case where the parties agreed to a kompetenz-kompetenz clause essentially was insulated from any form of judicial review. *Id.* at 141-42.

Despite these different formulations, however, and despite the principle's presumption in favor of allowing arbitrators to decide their own jurisdiction, it appears that every country adhering to the competence-competence principle allows some form of judicial review of the arbitrator's jurisdictional decision where the party seeking to avoid enforcement of an award argues that no valid arbitration agreement ever existed. *See id.* at 140-42. Even the traditional German model allowed for judicial review when the very making of the competence-competence agreement was challenged. *See* Adriana Dulic, First Options of Chicago, Inc. v. Kaplan *and the Kompetenz-Kompetenz Principle*, 2 Pepp. Disp. Resol. L.J. 77, 79 (2002). Furthermore, in 1985, the United Nations Commission on International Trade Law ("UNCITRAL") proposed its Model Law on International Commercial Arbitration, which prohibits parties from limiting the power of the arbitral tribunal to rule on its own jurisdiction, but which allows substantial opportunity for judicial review of that ruling. UNCITRAL Model Law on International Commercial Arbitration Art. 16. If a jurisdictional challenge is made, the arbitral panel either may issue a preliminary ruling on jurisdiction or may defer that decision until issuance of its final award. *Id.* In either case, the party challenging jurisdiction may seek judicial review of a tribunal's decision that it has jurisdiction over the dispute. *Id.* Both England and Germany, as well as nearly 40 other countries and several states within the United States have enacted legislation based on the Model Law. UNCITRAL, Status of Conventions and Model Laws (last modified Mar. 20, 2003).

It therefore seems clear that international law overwhelmingly favors some form of judicial review of an arbitral tribunal's decision that it has jurisdiction over a

dispute, at least where the challenging party claims that the contract on which the tribunal rested its jurisdiction was invalid. International norms of competence-competence are therefore not inconsistent with the Supreme Court's holding in *First Options*, at least insofar as the holding is applied in a case where, as here, the party resisting enforcement alleges that the contract on which arbitral jurisdiction was founded is and always has been void.

In sum, *First Options* holds that a court asked to enforce an arbitration award, at the request of a party opposing enforcement, may determine independently the arbitrability of the dispute. Although *First Options* arose under the FAA, the Court's reasoning in the case is based on the principle that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options*, 514 U.S. at 943, 115 S.Ct. at 1924. This rationale is not specific to the FAA. It is a crucial principle of arbitration generally, including in the international context. Indeed, even international laws and rules of arbitration that traditionally grant arbitrators more leeway to decide their own jurisdiction have allowed a party objecting to the validity of the agreement to arbitrate to seek judicial review of an arbitral panel's decision that it has jurisdiction under the alleged agreement. For these reasons, we hold that, under the rule of *First Options*, a party that opposes enforcement of a foreign arbitration award under the Convention on the grounds that the alleged agreement containing the arbitration clause on which the arbitral panel rested its jurisdiction was void *ab initio* is entitled to present evidence of such invalidity to the district court, which must make an independent determination of the agreement's validity and therefore of the arbitrability of the dispute, at least in the absence of a waiver precluding the defense.

In this case, the district court confirmed and enforced the arbitral award without opinion. Chi Mei asks us to reverse the district court's judgment and remand with instructions to enter judgment in its favor denying Minmetals' motion to confirm and enforce and granting its motion to dismiss. On this record, we cannot grant this relief. Although Chi Mei

proffered evidence suggesting that the contracts providing for arbitration were forged, Minmetals presented the sale of goods contracts and other documents evidencing the existence of valid contracts to the district court. In the alternative, Chi Mei asks that we remand the case to the district court for further proceedings to ascertain the validity of the contracts. Given the apparent dispute of facts, we agree that a remand is appropriate. On remand, the district court is free to treat Chi Mei's motion to dismiss as a motion for summary judgment, to entertain opposition to it, and to conduct such further proceedings as may be appropriate.

## B. WAIVER

Minmetals also argues that Chi Mei has waived the forgery/jurisdiction argument by participating voluntarily in the arbitration proceedings rather than seeking a stay of arbitration in the district court.[15] Chi Mei counters by arguing that it did not participate on the merits of the arbitration, but rather appeared only to object to jurisdiction and that, regardless of its participation on the merits, it preserved its right to challenge jurisdiction by properly objecting to jurisdiction and by arguing the forgery issue before the arbitral panel. Although it did not issue a written opinion, the district court plainly was concerned with this issue as it asked counsel for both sides numerous questions about waiver at oral argument.

We repeatedly have held under the FAA, including in our opinion in *First Options* in which the Supreme Court affirmed our judgment, that a party does not waive its objection to arbitrability where it raises that objection in arbitration: "A party does not have to try to enjoin or stay an arbitration proceeding in order to preserve its objection to jurisdiction. . . . A jurisdictional objection, once stated, remains preserved for judicial review absent a clear and unequivocal waiver. . . . Therefore, where a party objects to

---

15. We note that Minmetals contends that "Chi Mei waived its right to claim a lack of a written arbitral agreement," Appellee's br. at 18, and thus we do not consider the sometimes elusive distinction between the application of principles of waiver and estoppel. *See Slaney*, 244 F.3d at 591.

arbitrability but nevertheless participates in the arbitration proceedings, waiver of the challenge to arbitral jurisdiction will not be inferred." *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1510 (3d Cir. 1994), *aff'd*, 514 U.S. 938, 115 S.Ct. 1920; *see also Pa. Power Co. v. Local Union #272, IBEW*, 886 F.2d 46, 50 (3d Cir. 1989).

Minmetals argues that this case is different from our precedent under the domestic FAA because it arises under the Convention. Yet the principle we state on the limitation of waiver to jurisdiction of the arbitrators is well-settled in this court and Minmetals offers no compelling reason to ignore it here. There is, however, some question whether federal or state law should govern the waiver issue. In *Deutz*, we observed that "[f]ederal law applies to the interpretation of arbitration agreements" and that "[t]hus, 'whether a particular dispute is within the class of those disputes governed by the arbitration and choice of law clause is a matter of federal law.'" *Deutz*, 270 F.3d at 154 (quoting *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 43 (3d Cir. 1978)). We recognized, however, that the Supreme Court in *First Options* stated that a court deciding whether the parties agreed to arbitrate a certain matter should apply "ordinary state-law principles governing contract formation." *Id.* (citing *First Options*, 514 U.S. at 944, 115 S.Ct. at 1924). We went on to uphold the parties' choice of law by applying Pennsylvania law to the arbitrability dispute in that case, noting that *First Options*' principles concerning application of state law were no less applicable in the international context than under domestic arbitration law and that, in any event, application of federal law would not have altered the outcome of the case. *Id.* at 155.

In this case it appears that if state law is applicable it is that of New Jersey, the state in which Chi Mei is incorporated, has its offices, and does business.[16] New Jersey law may be somewhat more tolerant than federal law of the notion that a party may waive its objection to an arbitrator's jurisdiction by participating in arbitration

16. We note that to the extent that the parties treat state law as applicable they seem to assume that the law is that of New Jersey.

proceedings. In *New Jersey Manufacturers Insurance Co. v. Franklin*, 389 A.2d 980 (N.J. Super. Ct. App. Div. 1978), the New Jersey intermediate appellate court held that "[e]ven in the absence of a contractual submission of an issue to arbitration, a party may by conduct or agreement waive his legal right to judicial determination," but that "mere participation in the arbitration does not conclusively bar a party from seeking a judicial determination of arbitrability, even as late as the time of the claimant's application to confirm the award." *Id.* at 983, 984. On the other hand, the same court has held that "mere assertion of an objection does not dictate a finding of non-waiver." *Highgate Dev. Corp. v. Kirsh*, 540 A.2d 861, 863 (N.J. Super. Ct. App. Div. 1988). In *Franklin*, the court held that a party preserved its objection to an arbitrator's jurisdiction by clearly "flagging" that issue in its memoranda to the arbitrator while presenting what the court called a "mere alternative argument on the merits" in the same memoranda. *Franklin*, 389 A.2d at 984-85. In *Kirsh*, the court found a waiver where a party entered what the court suggested was a "nominal objection to the arbitrator's jurisdiction" and proceeded to participate fully in the merits of the arbitration and even filed its own counterdemand for arbitration. *Kirsh*, 540 A.2d at 863-64. Finally, the New Jersey Supreme Court, in dicta, has noted that a party may preserve its objection to an arbitrator's jurisdiction in an uninsured motorist case by "making an objection to the propriety of the arbitration on the ground of no coverage and participating in the arbitration proceeding under protest to decide the other . . . questions." *In re Arbitration Between Wilmer Grover and Universal Underwriters Ins. Co.*, 403 A.2d 448, 452 (N.J. 1979).

The record in this case makes clear that Chi Mei's participation in the CIETAC proceedings largely was limited to arguing the forgery issue. Although it appears to have presented at least one alternative argument, it consistently objected to the arbitral panel's jurisdiction both in the arbitration proceedings and before the district court. App. at 41-45. Furthermore, its decision to proceed with the arbitration despite its jurisdictional objection was likely necessary to prevent an award being entered against it in its absence; it appears that Minmetals may not have had

sufficient contacts with New Jersey or the United States for it to have been subject to the jurisdiction of the federal district court in New Jersey or elsewhere, so that Chi Mei likely would not have been able to initiate suit against it to enjoin the arbitration, at least not in the United States.[17] *See id.* at 212. Thus, whether we apply federal law or New Jersey law, the result is the same: Chi Mei did not waive its objection to CIETAC's jurisdiction inasmuch as it participated in the arbitration primarily to argue the forgery/jurisdiction issue and consistently objected to CIETAC's jurisdiction throughout the proceedings.[18]

## IV.   CONCLUSION

For the foregoing reasons, we will vacate the order of the district court entered June 11, 2002, and the judgment of the district court entered August 22, 2002, and remand this case to that court for further proceedings consistent with this opinion.

---

17. Our result would not be different even if Chi Mei could have initiated an action in the United States to enjoin arbitration and have obtained jurisdiction over Minmetals in that action.

18. Because we hold that the district court has an obligation to determine the validity of an agreement to arbitrate where a party raises that point as an issue before it may enforce a CIETAC award, we need not reach Chi Mei's arguments raising defenses under Article V of the Convention. If the court holds on remand that the agreements are valid, Chi Mei's arguments regarding defenses may require resolution.

ALITO, *Circuit Judge, concurring*:

I join the Court's opinion but write separately to elaborate on the importance of Article IV, Section 1(b) of the Convention in this case. As the Court notes, "the crucial principles . . . that arbitration is a matter of contract and that a party can be forced to arbitrate only those issues it specifically agrees to submit to arbitration . . . suggest that the district court here had an obligation to determine independently the existence of an agreement to arbitrate." Opinion of the Court at 14. These principles find expression in Article IV, Section 1(b), which provides that a party seeking to enforce an arbitral award must, "at the time of the application, supply . . . [t]he original agreement referred to in article II or a duly certified copy thereof." Convention at art. IV, § 1(b). Because a party seeking to enforce an arbitral award cannot satisfy this obligation by proffering a forged or fraudulent agreement, this provision required the District Court to hold a hearing and make factual findings on the genuineness of the agreement at issue here.

Article IV, Section 1(b), as noted, requires a party seeking enforcement to supply the court with "[t]he original agreement referred to in article II," and it is apparent that this means that the party seeking enforcement must provide the court with either a duly signed written contract containing an arbitration clause or an agreement to arbitrate that is evidenced by an exchange of letters or telegrams. Article II provides as follows:

> 1. Each Contracting State shall recognize *an agreement in writing under which the parties undertake to submit to arbitration* all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.
>
> 2. The term *'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.*
>
> 3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have

made *an agreement within the meaning of this article*, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

*Id.* at art. II (emphasis added). Article II thus refers to an "agreement" on three occasions: (1) when discussing the obligation of each "Contracting State" to "recognize an agreement in writing"; (2) in defining an "agreement in writing"; and (3) in requiring the court in which enforcement is sought to compel arbitration when the parties "have made an agreement within the meaning of" Article II. Both the first and second references concern an "agreement in writing," and the third reference merely directs the reader to a definition of "agreement" set forth elsewhere in Article II. Since an "agreement in writing" is the only type of "agreement" discussed in Article II, it seems clear that an "agreement referred to in article II" means an "agreement in writing" as defined in that Article. Thus, a party seeking enforcement of an arbitral award under Article IV must supply the court with an "agreement in writing" within the meaning of Article II.

An "agreement in writing," Article II tells us, means "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." *Id.* at art. II, § 2. To enforce the award granted by the arbitral tribunal, Minmetals was therefore required to demonstrate to the District Court that it and Chi Mei had agreed to arbitrate any dispute arising out of the purported nickel contracts and that they had done so by means of either (1) a written contract signed by both parties or (2) an exchange of letters or telegrams between them. Since Minmetals does not contend that Chi Mei agreed to arbitrate disputes relating to the purported nickel contracts by way of an exchange of letters or telegrams, it follows that Minmetals was required to prove to the District Court that Chi Mei signed a written agreement to arbitrate the dispute adjudicated by the arbitral tribunal. Chi Mei specifically disputes this issue, claiming that the signatures of its officers on the purported nickel contracts were forged. As a result, the Convention required the District Court to

inquire into whether Chi Mei's officers signed the purported nickel contracts.

Minmetals contends, however, that where an arbitral tribunal has already determined that the parties entered into a written agreement to arbitrate their dispute, the Convention requires the District Court to assume that the tribunal's determination was correct. Minmetals's reading of the Convention, however, would render the prerequisites to enforcement of an award set forth in Article IV superfluous. It is well established that " 'courts should avoid a construction of a statute that renders any provision superfluous.' " *United Steelworkers of Am. v. North Star Steel Co.*, 5 F.3d 39, 42 (3d Cir. 1993) (*quoting Pennsylvania v. United States Dept. of Health and Human Servs.*, 928 F.2d 1378, 1385 (3d Cir. 1991)). If Minmetals's reading were correct, there would be no purpose for Article IV, Section 1(b)'s requirement that a party "applying for recognition and enforcement" of an arbitral award supply the court with the parties' signed, written agreement or exchange of letters or telegrams. On Minmetals's view, the existence of a valid agreement would be conclusively established once the party seeking enforcement pointed out the portion of the arbitral tribunal's decision in which it found that the parties had entered into a written agreement to arbitrate, and therefore Minmetals's position would make the Convention's requirement that the party seeking enforcement submit the original agreement a meaningless formality.

The better reading of Article IV — which comports with fundamental principles of arbitration — requires that the party seeking enforcement both (1) supply a document purporting to be the agreement to arbitrate the parties' dispute and (2) prove to the court where enforcement is sought that such document is in fact an "agreement in writing" within the meaning of Article II, Section 2. In the present case, accordingly, Minmetals was required to demonstrate to the District Court that an officer of Chi Mei signed the purported nickel contracts. Because the District Court ordered the award enforced without requiring Minmetals to make that showing, its decision must be vacated.

31

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*