**SBRMCOA, LLC, individually and on behalf of its members, Plaintiff**
**v.**
**BAYSIDE RESORTS, INC., TSG TECHNOLOGIES, INC., TSG**
**CAPITAL, INC., BEACHSIDE ASSOCIATES, LLC, Defendants**

Civil No. 2006-42

District Court of the Virgin Islands

Division of St. Thomas and St. John

April 18, 2007

917

JAMES M. DERR, ESQ., St. Thomas, U.S.V.I., *For SBRMCOA, Plaintiff.*

ARTHUR POMERANTZ, ESQ., St. Thomas U.S.V.I., *For Bayside Resort, Inc., Defendant.*

GREGORY H. HODGES, ESQ., St. Thomas, U.S.V.I., For TSG Technologies, Inc, and TSG Capital, Inc., Defendants.

PAULA D. NORKAITIS, ESQ., St. Thomas, U.S.V.I., *For Beachside Associates, LLC., Defendant.*

GOMEZ, *Chief Judge.*

918

**MEMORANDUM OPINION**

(April 18, 2007)

Before the Court is the joint motion of defendants, TSG Technologies, Inc., and TSG Capital, Inc., (collectively, "TSG"), Beachside Associates, LLC ("Beachside") and Bayside Resorts, Inc. ("Bayside"), to dismiss or to stay pending arbitration.

## I. FACTS

In 1998, Bayside recorded a Declaration of Condominium (the "Declaration") for the Sapphire Beach Resort and Marina condominiums ("Sapphire Beach"). SBRMCOA ("COA") was created to operate, manage and maintain the Sapphire Beach condominiums. Under the Declaration, COA was given "any and all powers granted by law, this Declaration, and the By-Laws to effectuate its purpose of operating, managing and maintaining the Condominium Property on behalf of all the Unit Owners ... ." [Mot to Dismiss, Ex. 8, Decl. at 4.A.] The By-Laws provide that, COA's Board of Directors "shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except those which by law or by the Declaration or by these By-Laws may not be delegated to the Board of Directors ... . The Board of Directors shall have the power to delegate its powers to committee, officers and employees." [Mot to Dismiss, Ex. 8, By-Laws at 3-4.]

Under the Declaration, Bayside was obligated to provide fresh water and wastewater treatment services to the condominiums. The cost of this service was made dependant on the installation, construction, maintenance, and operating costs associated with the water procurement.

In 1999, Bayside and TSG entered into a contract (the "1999 Agreement"). At its core, the 1999 Agreement is an agreement to provide water to COA's members. Specifically, TSG agreed to construct, operate, and maintain a reverse osmosis water treatment system at Sapphire Beach to provide the condominiums, including COA's members, with potable water. Pursuant to the 1999 Agreement, Bayside retained ownership of the storage and distribution systems that supplied COA with water service as well as the property upon which the water plant would sit.

919

TSG charged Bayside approximately $0.02 per gallon of water provided to COA's members. Those who were not members of COA were charged a different amount. The 1999 Agreement included a dispute resolution section. TSG and Bayside agreed to first negotiate, then mediate, and finally to arbitrate "any claim, controversy or dispute arising out of or relating to [the 1999] Agreement." (1999 Agreement at § 15.) Under these provisions, any necessary arbitration was to take place in St. Thomas, United States Virgin Islands.

In 2005, Bayside entered into an agreement with COA that similarly addresses the water supply to COA. Specifically, COA agreed to purchase water from Bayside for a price of $0.05 per gallon (the "2005 Water Supply Agreement").[1] The 2005 Water Supply Agreement was "contingent upon the execution of an agreement between Bayside and TSG pursuant to which TSG agrees to continue its sales of water to Bayside (or its designees) during the term of this Agreement provided payment is made by COA ... ." (2005 Water Supply Agreement at ¶ 17.) Like the 1999 Agreement, the 2005 Water Supply Agreement also addressed the ownership of the property related to the water plant:

> WHEREAS, Bayside owns (a) all of the real property described on Exhibit "A" annexed hereto (the "Real Property"); (b) all of the improvements situated on, in, or under the Real Property (the "Improvements") other than the Water Plant ... .

(2005 Water Supply Agreement at 1.)

Finally, the 2005 Water Supply Agreement included an arbitration clause that requires "any dispute or controversy arising out of or relating to" the 2005 Water Supply Agreement to be submitted to binding arbitration in the United States Virgin Islands. (2005 Water Supply Agreement at ¶ 16.)

Also in 2005, TSG, COA, and Bayside entered into a Consent to Assignment Agreement (the "Consent Agreement"). In the Consent Agreement, COA consented to the assignment by Bayside to TSG of the right to sell COA potable water pursuant to the 2005 Water Supply

---

[1] Beachside was assigned Bayside's mortgage on property in Sapphire Beach. According to the complaint, Bayside also holds a number of other outstanding debts to Beachside, and both Bayside and Beachside planned to use the Water Supply Agreement to help satisfy that debt.

Agreement. The Consent Agreement was signed by representatives from COA, TSG and Bayside.[2]

On January 18, 2006, TSG stopped producing potable water for COA. COA "prevented TSG from shutting off all water service to COA." (Compl. ¶ 24.) COA also changed the locks to the water facilities. (Compl. Ex. B.)[3]

On January 26, 2006, COA brought suit against Bayside and TSG in the Superior Court of the Virgin Islands. That suit was voluntarily dismissed.

On February 23, 2006, TSG's president sent COA an electronic message demanding that COA tender payment for past water service. TSG informed COA that failure to pay the requested amount would result in TSG turning off the water supply at Sapphire Beach. COA tendered a certified check in the amount of $57,097.73 that day, and received a receipt acknowledging "full payment and satisfaction of TSG demands relating to potable water and wastewater services" pursuant to the February 23, 2006 letter. (Compl. ¶ 27.) TSG nonetheless shut off the water supply. COA thereafter forcibly restored water service to Sapphire Beach.

COA brought suit against TSG in this Court on March 8, 2006, alleging five separate counts. In Count One, COA alleges that TSG, Bayside, and Beachside violated the Racketeer Influenced Corrupt Organizations Act ("RICO") by conspiring together to extort money from COA in the form of increased water fees.

In Count Two, COA alleges a breach of contract by either Bayside or TSG. First, COA alleges that the 2005 Water Supply Agreement and the Consent Agreement are void. COA asserts that if they are found void by this Court, then Bayside has failed to fulfill its obligations under the Declaration to provide COA with water services. Alternatively, COA alleges that if the 2005 Water Supply Agreement and the Consent

---

[2]    Both the 2005 Water Supply Agreement and the Consent Agreement were signed and executed by the then-president of COA's board, Myron Poliner. Beachside has attached an affidavit of Myron Poliner to a separate motion to dismiss.

[3]    COA has attached a letter from the counsel for Bayside to COA, dated February 10, 2006, in which Bayside requests that COA stop entering the water facilities at Sapphire Beach and allow Bayside's representatives access to the same. Attachments to a complaint are considered part of a complaint. FED. R. CIV. P. 10(c). Accordingly, this letter may be considered by the Court.

Agreement are valid, then TSG, as the assignee of Bayside, has breached its obligations to provide water to COA in accordance with the Declaration.

In Count Three, COA seeks a declaratory judgment that

> in accordance with ... the Declaration of Condominium, the portions of the water treatment and wastewater treatment systems, together with associated pumps, plumbing, ponds, storage facilities, pipes, and other components of said system ... together with those portions of Parcel 16-1 Remainder upon which such items are located, constitute Condominium Property and Common Interests of COA, that title is vested solely in COA, and that said property is free from all purported liens and encumbrances ...

(Compl. ¶ 50.) Alternatively, COA seeks a declaration that Bayside is obligated to convey such property to COA.

In Count Four, COA seeks a declaratory judgment against Bayside and TSG that the 2005 Water Supply Agreement and Consent Agreement are both void and without force. COA argues the agreements were the result of threats and coercion. Alternatively, COA argues the execution of the agreements were an *ultra vires* act by the Board.

In Count Five, COA seeks specific performance on the Declaration from Bayside to compel Bayside to convey to COA property not previously conveyed, including the water system.

Each Count incorporates by reference the preceding portions of the Complaint.

TSG has filed a motion to dismiss or stay pending arbitration. All defendants joined TSG's motion. The defendants note that COA's suit arises out of the 1999 Agreement and the 2005 Water Supply Agreement, both of which contain arbitration or mediation clauses. As such, the defendants argue this matter should be stayed and the parties ordered to arbitration, or the matter should be dismissed entirely. TSG has agreed to continue providing water services during the pendency of this litigation.

## II. DISCUSSION

Congress enacted the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, to overcome judicial resistance to arbitration. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 126 S. Ct. 1204, 1207, 163 L.

Ed. 2d 1038 (2006).[4] "[U]pon being satisfied that the making of the agreement for arbitration ... is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. If a party to an agreement that requires arbitration alleges wrongdoing that involves matters covered by an arbitration agreement, "the claims must be arbitrated, regardless of the legal labels ascribed to them." *RCM Tech., Inc. v. Brignik Tech., Inc.*, 137 F. Supp. 2d 550, 553 (D.N.J. 2001). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991)).

## III. Analysis

COA's Complaint challenges the validity of the 2005 Water Supply Agreement, which contains an arbitration clause. That clause provides that:

> Subject to the provisions of Paragraph 7 [which grant COA and TSG the right to seek injunctive relief in the event that damages from a breach of the 2005 Water Supply Agreement are irreparable], any dispute or controversy arising out of or relating to this Agreement shall be submitted to and settled by mandatory binding arbitration to be held in the USVI, in accordance with the rules of the American Arbitration Association.

(2005 Water Supply Agreement ¶ 16.)

Under the FAA, federal courts are required to enforce written agreements to arbitrate disputes. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001) ("The FAA compels judicial enforcement of a wide range of written arbitration agreements."); *see also Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003). To determine whether this matter must be submitted to arbitration, this Court must first address the scope of this arbitration clause. Second,

---

[4] The FAA provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

the Court must determine whether or not each claim is covered by the arbitration clause.

## A. The Scope of the Arbitration Clause

██ The 2005 Water Supply Agreement's arbitration clause applies to "any dispute or controversy arising out of or relating to" the 2005 Water Supply Agreement. Accordingly, the scope of this arbitration clause is considered broad. *See Calamia v. Riversoft, Inc.*, Civ. No. 02-1094, 2002 Dist. LEXIS 23855 at *9 (E.D.N.Y. Dec. 13, 2002) (distinguishing between narrow and broad arbitration clauses, and noting the "paradigm broad clause ... allows arbitration for 'any claim or controversy arising out of or relating to the agreement' ... ."). With broad arbitration agreements, "[i]f the allegations underlying claims, 'touch matters' covered by the arbitration clause in a contract, then those claims must be arbitrated, whatever the legal labels attached to them." *Brayman Constr. Corp. v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003) (citing *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987)).

## B. Arbitrability of COA's Claims

### 1. Count One

██ The civil RICO claim, at its core, alleges that the defendants intentionally conspired to extort money from COA in the form of increased water fees. Water fees are one of the key terms in the 2005 Water Supply Agreement, which are squarely within the scope of the arbitration clause. *See RCM Tech. Inc.*, 137 F. Supp. 2d at 556 ("In assessing whether a dispute falls within the scope of an arbitration clause, the court's focus is on the factual allegations in the complaint rather than the legal causes of action asserted."). Accordingly, Count One is arbitrable.

### 2. Count Two

Count Two asserts two alternate theories of relief, both relating to a breach of an obligation to provide water services to COA. One of these theories asserts that the 2005 Water Supply Agreement and the Consent Agreement are void and thus Bayside has breached its obligation to provide water services to COA. Alternatively, if the contracts are found

valid, COA argues that TSG, as an assignee of Bayside, has breached its obligation to provide water services to COA.

The essential breach of which COA complains is the alleged failure—by either TSG or Bayside—to provide water services to COA. The provision of water services is clearly at the center of the 2005 Water Supply Agreement. Stripped of all its labels, Count Two of COA's Complaint invites this Court to address a breach of an obligation to provide water. If the 2005 Water Supply Agreement is valid, however, that position could lead to competing tribunals—this Court and an arbitrator—each addressing an alleged factual circumstance—the failure to provide water. The purpose of arbitration would be turned on its head as this Court would be responsible for determining an arguably separate, but clearly related, matter that is also subject to arbitration. Congress clearly did not intend such an absurd result. The Court accordingly will decline COA's invitation to create such a situation. The factual underpinnings that give rise to Count Two are arbitrable. *See RCM Tech., Inc.*, 137 F. Supp. 2d at 556.

This Court also finds support in concluding that Count Two is arbitrable upon review of the nature of the legal claim made in Count Two. Generally, a claim that a contract is void is not arbitrable because it is for the court, not an arbitrator, to determine whether a contract exists. *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 105-07 (citing *Three Valleys Mun. Water Dist. v. E.F. Hutton Co., Inc.*, 925 F.2d 1136, 1140 (9th Cir. 1991)). However, an arbitrator will determine issues of contract validity when a party challenges a contract as voidable, by claiming that it was induced by "fraud, mistake, or duress, or where breach of a warranty or other promise justifies the aggrieved party in putting an end to the contract." *Id.* at 107 (quoting *Three Valleys Municipal Water Dist.*, 925 F.2d at 1140 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 7 cmt. b (1981))); *see also Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 53 (3d Cir. 1980) (holding that whether the plaintiff entered into an arbitration agreement was a matter for judicial review); *cf. China Minmetals Materials Imp. and Exp. Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 282 (3d Cir. 2003) (explaining that when a contract is alleged to be voidable, rather than void, arbitration may be appropriate).

"Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the

parties did or did not enter into such an agreement." *Par-Knit Mills, Inc.*, 636 F.2d at 54; *see also* 9 U.S.C. § 4.

> A party may, in an effort to avoid arbitration, contend that it did not intend to enter into the agreement which contained an arbitration clause. ... An unequivocal denial that the agreement had been made, accompanied by supporting affidavits ... in most cases should be sufficient to require a jury determination on whether there had in fact been a meeting of the minds.

*Par-Knit Mills, Inc.*, 636 F.2d at 55 (3d Cir. 1980) (internal quotations omitted).

COA provides two alternative reasons why the agreements are void. COA first argues that the 2005 Water Supply Agreement and the Consent Agreement were *ultra vires* acts of the previous board of COA, because they were executed without an affirmative vote by two-thirds of the common interest of members of COA and without the approval of the first priority mortgage holders for the condominium units. In the alternative, COA alleges that the 2005 Water Supply Agreement and the Consent Agreement are void because they were obtained through coercion.

### a. *Ultra Vires*

"The doctrine of 'ultra vires' has application only where the subject matter of the contract is foreign to the purposes for which the corporation was created." *In re Trimble Co.*, 339 F.2d 838, 844 n.7 (3d Cir. 1964). If the contract was beyond the power of the Board and is ultra vires, then it is void. *Cf. CSX Transp., Inc. v. City of Garden City*, 325 F.3d 1236, 1240 (11th Cir. 2003) ("If a contract is beyond the power or competence of the local government, then the contract is termed ultra vires and is void.").

COA's Complaint does not allege that COA lacked the capacity to enter into the 2005 Water Supply Agreement or that entering the agreement was beyond the scope of COA's authority. In fact, the Declaration provides COA with "any and all powers granted by law, this Declaration, and the By-Laws to effectuate its purpose of operating, managing and maintaining the Condominium Property on behalf of all the Unit Owners ... ." [Mot to Dismiss, Ex. 8, Decl. at 4.A.] One could not reasonably argue that entering agreements to assure that utilities,

including water, were supplied to the condominium units was beyond the scope of COA's authority. The subject, matter of the 1999 Agreement, the 2005 Water Supply Agreement, and the Consent Agreement all addressed supplying water to COA. The supply of water is not foreign to the purposes for which COA was created—to operate, manage, and maintain the condominiums.

Rather than make a legitimate *ultra vires* claim, COA argues that the previous board did not comply with COA's internal operating requirements for approval of the 2005 Water Supply Agreement. COA has provided no evidentiary support for this. As the Third Circuit explained in *Par-Knit,* and recently restated, "'[a] naked assertion ... by a party to a contract that it did not intend to be bound by the terms thereof is insufficient' to raise an issue of fact about the existence of an agreement to arbitrate." *Digital Signal, Inc. v. Voicestream Wireless Corp.*, 156 Fed. Appx. 485, 487 (3d Cir. 2005) (unpublished) (reversing order denying motion to dismiss and compel arbitration) (quoting *Par-Knit Mills, Inc.*, 636 F.2d at 55).

It is undisputed that there is a signed 2005 Water Supply Agreement containing an arbitration clause. The validity of that arbitration agreement is countered only by COA's denials. COA has provided no affidavits to support its argument that Myron Poliner did not have the authority or capacity to sign the 2005 Water Supply Agreement on behalf of COA. Beachside, on the other hand, has provided the Court with Poliner's affidavit indicating he was authorized by the Board to execute the agreement. [Mot. To Dismiss, Ex. 5.] Thus, COA's allegation that it did not intend to be bound by the 2005 Water Supply Agreement is simply an unsupported assertion that is insufficient to seriously raise an issue of fact regarding the existent of the agreement to arbitrate. *See Digital Signal, Inc.*, 156 Fed. Appx. at 487.

### b. Coercion

COA also alleges that the 2005 Water Supply Agreement and the Consent Agreement were obtained through coercion and threats. While COA regards coercion and threats in contract formation as conditions that lead to a void contract, COA is mistaken. "If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim." RESTATEMENT (SECOND) OF CONTRACTS, § 175; *see also*

927

*Halstead v. Am. Int'l Group, Inc.*, 2005 U.S. Dist. LEXIS 6549 (D. Del. 2005) ("Contracts ... that are executed under duress are voidable." (citing RESTATEMENT (SECOND) OF CONTRACTS § 175)).

█ A claim that a contract is voidable is arbitrable. *See China Minmetals Materials Imp.*, 334 F.3d at 282. Accordingly, Count Two is subject to arbitration.

### 3. Count Three

█ Count Three seeks a declaration that COA has title to certain property, including the property upon which the water treatment plant sits. The 2005 Water Supply Agreement explicitly states that Bayside owns the property about which COA seeks a declaration as to ownership. The issue of ownership of the property upon which the water treatment plant sits is squarely addressed within, and directly touches on matters covered by, the 2005 Water Supply Agreement. Count Three must be arbitrated as well. *See, e.g., Brayman Constr. Corp.*, 319 F.3d at 626 (finding that claims that arose under a workers' compensation insurance policy were subject to arbitration when they were sufficiently related to a separate agreement that required an additional premium on the policy under certain circumstances when the separate agreement had an arbitration clause).

### 4. Count Four

█ Count Four seeks a declaration that the 2005 Water Supply Agreement and Consent Agreement are void because their execution were ultra vires acts and resulted from threats and coercion. Like Count Two, Count Four is substantively a claim that the 2005 Water Supply Agreement and Consent Agreement are voidable.

A claim that an entire contract is voidable clearly touches on matters covered by the broad arbitration clause. *See Prima Paint Corp. v. Flood and Conklin Mfg. Co,*, 388 U.S. 395, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967) (holding that claims of fraud in the inducement of the entire contract must be considered by the arbitrator in the first instance); *see also Buckeye*, 126 S. Ct. at 1208-09 (holding that a claim that the contract as a whole is rendered invalid by a usurious finance charge must first be considered by an arbitrator). Count Four is also appropriate for arbitration.

### 5. Count Five

█ Count Five seeks an order compelling Bayside to convey the property to COA. As explained above, the ownership of the property to which COA seeks a conveyance is an issue directly addressed by the 2005 Water Supply Agreement. Therefore, under the broad arbitration clause, Count Five is subject to arbitration.

## IV. CONCLUSION

For the reasons set forth above, the Court finds that all claims are subject to arbitration. Accordingly, the motion to dismiss will be granted and this matter shall be referred to arbitration. *See Seus v. John Nuveen & Co.,* 146 F.3d 175, 179 (3d Cir. 1998) ("If all the claims involved in an action are arbitrable, a court may dismiss the action instead of staying it.") An appropriate order follows.